[Crim. No. 18361. In Bank. Oct. 23, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD ROBIN LEACH et al., Defendants and Appellants.

420

422

**COUNSEL**

Richard H. Levin and John J. Schimmenti, under appointments by the Supreme Court, for Defendants and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph P. Busch, District Attorney, Harry B. Sondheim and Daniel L. Bershin, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

WRIGHT, C. J.— ■ We hold herein that if hearsay evidence of the declarations of coconspirators uttered after the attainment or abandonment of the principal objective of a conspiracy is to be admitted for the truth of the matters asserted on the ground that the declarations were made during and in furtherance of a "continuing" conspiracy, there must be adduced otherwise admissible evidence which is sufficient to establish

prima facie, independently of the hearsay evidence in issue, that the conspiracy continued in existence through the time the declarations were made. Under this holding we find that hearsay evidence of certain coconspirators' declarations was erroneously admitted at the trial of these causes. We also find, however, that such error was not prejudicial to either of the defendants and accordingly affirm the judgments of conviction.

## I. FACTS

During the evening of December 24, 1970, a sporting goods store salesman in Los Angeles County was robbed of a .38 caliber revolver by a pair of men. One of the robbers had asked to see the revolver, then loaded it and ran off, brandishing the weapon at the protesting salesman. Later that evening attendants of two liquor stores and a gas station were robbed, apparently by the same two men. One of the robbers was identified as Jerry Morrison, and officers of the Los Angeles Sheriff's Department accordingly made inquiries at an apartment building which Morrison was known to frequent. One resident of that building, Bonnie Sue Mayo, identified Morrison and appellant Donald Leach as having been present earlier that evening, in possession of a gun. The apartment building was placed under surveillance in anticipation of Morrison's return.

About five miles away from the staked-out apartment building, Howard Kramer was murdered in his home early in the morning of Christmas day, 1970. The police were called by the victim's wife, Edith Kramer, and arrived to find the victim dead from multiple gunshot wounds. Mrs. Kramer informed the police that she had been awakened by loud male voices and then had heard shots. There were no signs of a forced entry.

Shortly after the time of the murder, Morrison and Leach arrived at the apartment building and were arrested by the waiting officers. A .38 caliber revolver was found in Leach's jacket pocket at the time of his arrest; a booking search later revealed a key and a cash register receipt in Leach's pants pockets. The revolver was the one stolen from the sporting goods store and had fired the bullets and shell casings found at the scene of the murder. The key was one of two keys originally given to the victim by the realtor through whom he had rented his house. The cash register receipt was from the Go Room, a bar at which were employed both Bonnie Sue Mayo and the victim's daughter appellant Lorraine Kramer.

The receipt bore handwriting giving the name, age, address, and description of the victim.

In addition to the foregoing evidence linking Morrison and Leach to the murder, there was evidence that the two had been seen with a gun on the night of the murder not only at Bonnie Sue Mayo's apartment but also at the Go Room. Morrison was duly tried and convicted of first degree murder for the death of Mr. Kramer. Leach, who was 17 years old at the time of the crime, had his trial delayed, first while it was determined that he was not a fit subject for juvenile court proceedings (Welf. & Inst. Code, §§ 602-606, 650 et seq., 707; see *People* v. *Lara* (1967) 67 Cal.2d 365, 380 [62 Cal.Rptr. 586, 432 P.2d 202]), and then while he pursued appellate review of the trial court's refusal to set aside the information upon which he had been committed (Pen. Code, §§ 995, 999a).

While confined in the Los Angeles County jail during the summer of 1971, Leach struck up a friendship with a trusty named Hagler. Hagler believed he was soon to be released. Upon learning of this, Leach recruited Hagler to collect upon his release $10,000 which Leach claimed was owed him for the murder for which he had been arrested. Upon obtaining payment of this sum Hagler was to keep half for himself. There were various plans for disposing of the other half: at first, he was to give it to Leach's mother; later he was to hire an attorney for Leach; a third alternative was to use it to set up an escape attempt by Leach. In order to facilitate Hagler's collection of the money, Leach confided in him the details of the murder.

According to Leach, he had been staying at the apartment of Bonnie Sue Mayo, who had approached him about whether he would kill somebody for a fee. He had agreed to do so for $10,000. Mayo had brought Lorraine Kramer to her apartment to meet Leach; Lorraine had said her mother was also involved. Leach had received only a few hundred dollars in advance; the balance was to have been paid through Mayo in installments of $1,000 or $2,000 after the Kramers had collected insurance for the death of the victim. Mayo herself was to receive $2,000. Lorraine had given Leach a key to the front door and a piece of paper with her father's description on it. Leach had first gone to the victim's home to carry out the murder with a knife, but had found only Mrs. Kramer at home. He had checked with Lorraine for her father's hours at home. By then he had stolen the revolver from the sporting goods store and had driven to the Kramer house with Morrison. He had let himself in, been accosted by Mr. Kramer, and had shot him.

At times Leach instructed Hagler to go to Mayo to get the money. At other times, however, he maintained that he was being "burnt" by Mayo and that Hagler should instead go directly to the Kramers, collecting the entire $12,000 on behalf of Leach, with nothing to go to Mayo.

Leach confided in Hagler from June through October 1971. Hagler began informing authorities of Leach's admissions in September of 1971. The investigating officers had had suspicions about a murder-for-hire plot based on the materials found on Leach at the time of his arrest, and in light of Leach's admissions sought to cement their case.

A sheriff's deputy represented himself to Edith and Lorraine Kramer as a jailhouse friend of Leach, who had asked him to tell the Kramers that Leach would implicate them if they did not get Leach a lawyer with the money owed him. In the course of these conversations, which were tape recorded, Lorraine and Edith Kramer both made a series of extremely incriminatory, express and reciprocally adoptive admissions.[1] (See *People* v. *Osuna* (1969) 70 Cal.2d 759, 765 [76 Cal.Rptr. 462, 452 P.2d 678].)

Leach, Lorraine and Edith Kramer, and Bonnie Sue Mayo were subsequently tried jointly for the murder of Howard Kramer. Mayo testified that she had introduced Leach to Lorraine Kramer as a person who might be willing to do "a job" for Lorraine concerning her father. Mayo maintained that she had understood this to involve a beating or vandalism. Lorraine Kramer admitted plotting to kill her father in her trial testimony, which was mainly directed towards exonerating her mother and depicting her father's many monstrous misdeeds against his

---

[1]The undercover deputy later took the Kramers to see a second undercover officer, who was posing as an attorney. The Kramers discussed arranging representation for Leach with the supposed attorney. These discussions were secretly videotaped, but the tapes and their contents were suppressed by the trial court. The trial court justified its suppression order on three grounds: that the admissions so obtained amounted to a confession which the People had failed to prove was voluntary; that the stratagem employed had violated the Kramers' reasonable expectations of privacy in their conference with the ostensible attorney; and that the exploitation by the police of the sanctity of the attorney-client relationship for the express purpose of eliciting self-incriminating statements from a suspect was so fundamentally unfair as to work a denial of due process.

The People and the District Attorney of Los Angeles County (as amicus curiae) urge us to review the suppression of the Kramers' admissions to the feigned attorney should we reverse either of the judgments of conviction before us on this appeal. Since we affirm both judgments, we need decide neither the extent of our discretion, if any, to review upon a defendant's appeal evidentiary rulings adverse to the People (see Pen. Code, § 1259), nor the merits of the particular ruling here tendered for such review.

family.[2] Edith Kramer testified that she had had no advance knowledge of her daughter's plan to have Howard Kramer killed, and joined several other witnesses in corroborating Lorraine's account of the decedent's brutality. Leach admitted through counsel that he had "pulled the trigger" and conceded guilt of second degree murder.[3] Leach himself did not testify, but sought to establish through the direct testimony of two witnesses and by cross-examination of others that he had been intoxicated by drugs at the time of the killing and hence had lacked the mental capacity to commit first degree murder.

Mayo was acquitted and the Kramers were each convicted of second degree murder (Pen. Code, §§ 187, 189). Leach was convicted of first degree murder (Pen. Code, §§ 187, 189) and of the armed robbery (Pen. Code, § 211) by which he had acquired the murder weapon, and was found to have used a firearm in the commission of each crime. (Pen. Code, § 12022.5.) Leach[4] and Lorraine Kramer[5] were sentenced to state prison for the terms prescribed by law and have appealed their

[2]Lorraine Kramer testified at length at trial about her father's brutality, which included instances of beating Lorraine and her mother, holding a gun to her mother's head, throwing his crippled son through a window, and sexually molesting each of Lorraine's three sisters. Each sister testified at trial to having suffered such molestation, which as to one sister extended to having actually been raped by her father at the age of 11.

[3]The unequivocal nature of Leach's concession of guilt may be gauged from the following excerpt from his counsel's closing argument to the jury:
"What is the ultimate issue in this case? It comes as no surprise to you—I am sure it doesn't come as any surprise to the prosecution—that the only issue in this case, as I told you from the very start, is whether or not, under the law, Donald Leach is guilty of first or second degree murder. Make no mistake. Donald Leach is guilty of murder,—absolutely and positively—but you must determine, under the law, whether he is guilty of first or second degree murder."

[4]In addition to the crimes for which he stood trial, Leach had been charged with having committed 3 more armed robberies during the same 24-hour period. After his murder conviction Leach pleaded guilty to these robberies. Following trial Leach was sentenced to the prescribed term of life imprisonment for his murder conviction (Pen. Code, § 190) and concurrently (Pen. Code, § 669) to the prescribed five-years-to-life term for first degree robbery (Pen. Code, § 213), with an additional five-years-to-life term to be served consecutively pursuant to the proven allegation of the use of a firearm. Upon his subsequent pleas of guilty to the three additional armed robberies, Leach was sentenced to the prescribed five-years-to-life terms on each count, these sentences to be served consecutively to each other but concurrently (Pen. Code, § 669) to Leach's earlier sentences.

[5]Lorraine Kramer was sentenced to the prescribed five-years-to-life term in state prison (Pen. Code, § 190), subject to resentencing following psychiatric and diagnostic evaluation by the Department of Corrections. (Pen. Code, §§ 1168, 5079.) No change in sentence was ordered following such evaluation.

judgments of conviction; Edith Kramer[6] was granted probation and has not appealed.

## II. INADMISSIBILITY OF COCONSPIRATORS' DECLARATIONS

Both Leach and Lorraine Kramer claim that the coconspirator exception to the hearsay rule (Evid. Code, § 1223) was improperly invoked to admit against each of them evidence of the extrajudicial declarations of their ostensible coconspirators. Leach complains of the admission against him of the tape recordings of Edith and Lorraine Kramer's conversations with the undercover deputy sheriff. Lorraine Kramer objects to the admission against her of Hagler's testimony reciting Leach's jailhouse narrative of the facts of the murder conspiracy.

### A. EXPLICATION OF *People* v. *Saling*

The gravamen of these objections is that any conspiracy which might have existed between the Kramers and Leach was solely a conspiracy to commit the murder of Howard Kramer, and so ended with the successful perpetration of that murder. All the parties to this appeal appear to agree that the controlling law on the time of termination of murder-for-hire conspiracies is set forth in *People* v. *Saling* (1972) 7 Cal.3d 844, 851-853 [103 Cal.Rptr. 698, 500 P.2d 610]. We share the parties' views on the pertinence of *Saling* and accordingly preface our discussion of the issues jointly raised by *Saling* and the instant case with a detailed explication of the facts of *Saling* and the views expressed therein as to the proper scope of Evidence Code section 1223, California's codification of the long-established "coconspirator exception" to the hearsay rule under the common law of evidence.[7] (See generally 4 Wigmore, Evidence (Chadbourne rev. 1972) § 1079, pp. 180-186; Levie, *Hearsay and Conspiracy* (1954) 52 Mich.L.Rev. 1159, 1161-1164.)

---

[6]Edith Kramer, having been free on bail throughout her trial, was granted probation following temporary commitment to a diagnostic facility of the Department of Corrections. (Pen. Code, § 1203.03.) Among the conditions of her probation was one year of incarceration in the county jail.

[7]Section 1223 provides:

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

### 1. FACTS OF *Saling*

In *Saling* the defendant had been hired by Murphy (see *People* v. *Murphy* (1972) 8 Cal.3d 349 [105 Cal.Rptr. 138, 503 P.2d 594]) to assist in the murder of Murphy's wife. The principal witness against Saling was Jerry Carnes. Carnes testified that he had been approached by Murphy with an offer of money if he would "rough up" a recalcitrant debtor of Murphy. Carnes did not accept the offer but agreed to try and find someone who would accommodate Murphy. Carnes accordingly broached the offer to Saling, and subsequently took Saling to Murphy's house to introduce the two men. The pair discussed the job in the presence of Carnes. They agreed to a fee of $1,000, with $300 or $500 to be paid in advance.[8] In a later conversation with Murphy, Carnes learned that the planned battery would involve staging a hit and run accident while the victim was helping Murphy change a flat tire. Carnes was to participate in the scheme as a false witness.

On the day of the murder Carnes, Saling and Murphy had jointly reconnoitered the scene of the planned accident. That night Carnes parked his car in the arranged location. He saw Murphy drive past, accompanied by a female. Carnes waited another 45 minutes for Saling to appear. During this period Murphy and the woman drove past several times in both directions. Upset by his realization that the victim was to be a woman, Carnes finally decided to abandon the enterprise. After traveling some distance he encountered Saling driving towards the scene of the crime accompanied by Jurgenson, whose car Saling was driving. Saling disclosed that his delay in arriving had been caused by his being stopped by a policeman. Carnes then drove back to the spot where he had been waiting, followed by Saling. Murphy was no longer in the vicinity. Saling said he would find Murphy later, and Carnes left the area.

Three days later Carnes learned from a friend that Murphy's wife had been murdered on the night of the supposed battery of a debtor. Carnes thereupon went to Saling's home, where he encountered Jurgenson. Carnes sought an explanation for the murder of Murphy's wife. Jurgenson replied that the true nature of the job had been discussed in Carnes' absence. Jurgenson went on, at Carnes' urging, to describe the details of the murder, and over objection Carnes was allowed to repeat this narrative at Saling's trial.

---

[8]This narrative of the facts in *Saling* is drawn from both our opinion in that case and a fresh review of the record therein.

A fortnight or so after Jurgenson's narration, Jerry Carnes' brother Richard was used by Murphy as an intermediary to transmit $200 in cash to Jerry Carnes and $500 in cash to Saling. Shortly after this, through the assistance of the Carnes brothers, the police obtained tape recordings of conversations between Murphy and the Carnes brothers, each of which contained statements highly incriminating of Saling.

## 2. The *Saling* Rule on Termination of Conspiracies

The declarations of both Jurgenson and Murphy implicating Saling had occurred out of court and evidence of their content was offered to prove the truth of the matter asserted, i.e., that Saling had participated in the murder of Murphy's wife. This evidence was accordingly hearsay. (Evid. Code, § 1200.) Having disposed of the contention that Jurgenson's declaration was an adoptive admission of Saling (Evid. Code, § 1221; 7 Cal.3d at pp. 849-850, fn. 6), we treated the admissibility of this evidence as being governed exclusively by the coconspirator exception. First,[9] we rejected the contention that two conspiracies were involved, one to murder Murphy's wife, the other to obtain the proceeds of various insurance policies on the victim's life. We found that there was lacking in the record the requisite independent evidence to establish prima facie the existence of an insurance conspiracy.[10] Thus the dispositive question regarding the admissibility of evidence of the declarations became the time of the termination of the conspiracy to murder Murphy's wife.

[9]For the sake of clarity in the context of the instant case we have in encapsulating *Saling* reversed the order in which the issues of the termination of the conspiracy to murder Murphy's wife and the existence of an insurance conspiracy, respectively, were discussed in the *Saling* opinion itself.

[10]The independent evidence requirement is set forth somewhat awkwardly in subdivision (c) of Evidence Code section 1223 (see *ante,* fn. 7), where it is stated that evidence of the declaration of a coconspirator is inadmissible hearsay unless the "evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) [relating to the participation of the declarant and the defendant in a conspiracy, and the furtherance of that conspiracy by the declaration] or, in the court's discretion as to the order of proof, subject to the admission of such evidence." The court's discretion as to the order of proof makes the putative requirement of an *advance* showing of the preliminary facts in effect a requirement of an *independent* showing, since the change in the order of proof is more generally the rule than the exception. (See *People* v. *Morales* (1968) 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402].)

It is important to note that the independent evidence requirement of subdivision (c) makes no distinction among the several "facts specified in subdivisions (a) and (b)." In particular, subdivision (a) requires that the coconspirator's declaration have been "made by the declarant while participating in a conspiracy to commit a crime or civil wrong *and* in furtherance of the objective of that conspiracy" (italics added), and subdivision (b) requires in addition that the declaration have been "made prior to or during the time that the party [against whom evidence of the declaration is offered] was participating in

We recognized that "[i]t has long been the law in this state that a conspirator's statements are admissible against his coconspirator only when made during the conspiracy and in furtherance thereof," and that "[t]he conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated." However, since "[p]articular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy," we decided that it was "for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended." (7 Cal.3d at p. 852.) Since we found it "clearly" established that "the money offered by Murphy for killing his wife motivated [Saling] and Jerry Carnes to participate in the plan," and that "the transfer of the money was one of [the conspiracy's] main objectives as far as [Saling] and Carnes were concerned," *(id.)* we decided that the jury could properly have found that the conspiracy to murder Murphy's wife had not terminated until the time of payment of Saling and Carnes. "Since payment to either [Saling] or Carnes had not yet occurred by the time of the conversation between Carnes and Jurgenson only three days after the murder, Jurgenson's statements to Carnes were admissible as being made during the conspiracy." *(Id.)* However, since the recorded conversations of Murphy with the Carnes brothers "were clearly made not only after Catherine Murphy had been killed but also after payment had been made to [Saling] and Jerry Carnes," we ruled that evidence of these statements was inadmissible because they had not been "made during any activity in pursuance of any significant objective of the conspiracy." *(Id.,* at p. 853.) In this respect, we expressly adopted the holding of *Krulewitch* v. *United States* (1949) 336 U.S. 440, 443 [93 L.Ed. 790, 794, 69 S.Ct. 716], that conspiracies are not to be deemed still operative merely because the conspirators act in concert to avoid "detection and punishment." (7 Cal.3d at p. 853.)

---

that conspiracy." Thus, while only two subdivisions are used to set them forth, *three* preliminary facts are required to be established under section 1223 if evidence of the declaration of a coconspirator is to be admissible: (1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy. Section 1223 permits none of these facts to be established through the evidence of the declaration itself, save insofar as the content of the evidence must be considered in determining whether the declaration was in furtherance of what is established prima facie by independent evidence to have been the object of the conspiracy.

### 3. NARROW SCOPE OF *Saling* RULE

In light of the misunderstanding of *Saling* apparent in the rulings in this case by both the trial court and the Court of Appeal, two aspects of *Saling* demand special emphasis. First, *Saling* did not purport to declare that all conspiracies in which one conspirator is hired by another are to be deemed as a matter of law to continue until the hireling is paid to his satisfaction. Second, *Saling* was in no way contrary to the explicit language of Evidence Code section 1223 and its three-fold requirement of independent proof of preliminary facts. (See *ante*, fn. 10.)

Our ruling in *Saling* that evidence of Jurgenson's declaration was admissible under the coconspirator exception was premised on the "particular circumstances" of that case and had not one but three essential factual elements. To be sure, one element was that neither Carnes, the testifying witness, nor Saling, the defendant against whom the evidence was offered, had been paid in full at the time of Jurgenson's declaration. However, our holding was also expressly premised on the facts that Murphy's offer of money had been the motivation for the participation of both Saling and Carnes, and that the declaration had occurred "only three days after the murder." (7 Cal.3d at p. 852.) Nor did we intimate in any way that the "particular circumstances" which might keep a conspiracy alive after the commission of the crime which was its principal objective could be gleaned from the very evidence of a coconspirator's statement sought to be so admitted under the coconspirator exception. In *Saling* there was ample independent proof of the continuing nature of the conspiracy in question to establish preliminarily to any substantive consideration of the content of the proffered evidence of the declaration that the evidence was admissible under section 1223. Not only did one of the conspirators testify in court to the nature of and participants in the conspiracy, but also a non-conspirator testified to having witnessed previous associations of the conspirators and to having personally transmitted money from one conspirator to two others after the homicide contemplated by the conspiracy had been accomplished. Thus there was plentiful but nonetheless independent evidence in *Saling* that the conspirators had still been acting in concert at the time of the post-homicide, prepayment declaration of which evidence was therein deemed admissible.

### B. INAPPLICABILITY OF *Saling* TO ADMISSIONS HEREIN

■ No remotely comparable independent evidence of the existence of a continuing conspiracy to effect payment to Leach at the time of his

admissions, much less at the time of the Kramers' admissions, can be found in the record of this case. Although the trial court correctly observed that independent evidence of a continuing conspiracy was required by *Saling*,[11] such evidence is simply not to be found in this case. This is not to say that the trial court was incorrect in its finding that there had been a conspiracy to murder Howard Kramer (see *ante,* fn. 11); the circumstances of the murder and the evidence found on Leach at the time of his arrest were surely sufficient to make out a prima facie showing of a conspiracy. It is even arguable—although we do not decide this point—that this evidence of a conspiracy, in conjunction with the lack of any other apparent motive for Leach's participation, is sufficient to make out a prima facie showing that this was a murder-for-hire conspiracy involving some member of the Kramer household. But what *Saling* requires, and what is totally lacking in this case, is independent evidence that the conspiracy between Leach and the Kramers was *still operative* at the time of their respective admissions, notwithstanding the accomplishment of the primary objective of the conspiracy with the death of Howard Kramer.

Despite an intimation to the contrary by the trial court (see *ante,* fn. 11), we find no support in the record for the proposition that the conspiracy between Leach and the Kramers had as a primary objective not only the murder of Howard Kramer but also the collection of

[11]At one point in the pretrial hearing on the admissibility of the admissions of Leach and the Kramers, the trial court admonished the deputy district attorney that "*Saling* holds you can't look to the statements themselves to determine whether the conspiracy is continuing." The court's subsequent ruling was articulated as follows:

"[T]he court finds as a preliminary fact under Section 402 of the Evidence Code that there was a conspiracy to murder Howard Kramer, that that conspiracy included the obtaining of the proceeds of his insurance and the paying off of Mr. Leach, the alleged trigger man. The court finds for the purpose of Section 402 et seq. of the Evidence Code that the conspiracy was in existence obviously before the killing of Mr. Kramer. That conspiracy lasted at the very least until the arrest of Miss Mayo [on March 14, 1972, after the admissions of the Kramers had been elicited].

"The court finds under Section 402 of the Evidence Code that the members of the conspiracy were Mrs. Edith Kramer, Miss Lorraine Kramer, Mr. Donald Leach, Miss Bonnie Sue Mayo, and if necessary, Mr. Jerry Gene Morrison.

"The court will not detail the 1500 pages of evidence, a good deal of which related to this very issue which persuaded the court it existed and persisted. The court will simply say that the key and the cash register receipt bearing the name, age, and address of Mr. Kramer speak far more eloquently than the most damaging of confessions that could be made by anyone.

"The finding which has just been made has been made independent[ly] of any extrajudicial statement made by any codefendant in this case. Accordingly, it would follow that any and all statements made by any of the co-conspirators during the course and scope of and in furtherance of the conspiracy, if properly obtained, are admissible in evidence against the others."

insurance proceeds as a result of his death, and hence that the conspiracy was prolonged past the death of Howard Kramer not only for so long as Leach remained unpaid but also for so long as the insurance proceeds remained uncollected.

Other than portions of the admissions of the Kramers and Leach, the only evidence in the record arguably relating to such an "insurance conspiracy" (see *People* v. *Saling, supra,* 7 Cal.3d at p. 854) consists of the pretrial testimony of the trust fund administrator for Howard Kramer's union listing the sums paid by his office to Edith Kramer upon Howard Kramer's death, and a more inclusive stipulation at trial itemizing by amount all monies in the nature of insurance received by Edith Kramer following her husband's death. We have heretofore held in *Saling* that the mere fact that the principal in a murder-for-hire plot was the beneficiary of insurance on the life of the victim falls short of establishing prima facie the existence of an insurance conspiracy concurrently with the murder conspiracy. Indeed, we held in *Saling* that even the fact that such insurance was fraudulently obtained through the beneficiary's forgery of the insured's application does not transform the fact that such insurance was in force at the time of the insured's murder into prima facie proof of an insurance conspiracy. (7 Cal.3d at pp. 854-855.) It necessarily follows from the reasoning of *Saling* that the same result must obtain when the record reflects in addition nothing more than that the insurance in force was in due course actually collected by the murderous beneficiary. To hold otherwise would have the artificial effect of making virtually every inter-spousal murder conspiracy a prima facie insurance conspiracy as well, since many spouses have some sort of reciprocal life insurance in force, if only as an incident of employment in the form of private pensions or social security benefits. A murderer playing the part of a bereaved spouse is hardly likely to refuse to accept the payment of such insurance notwithstanding that the collection of insurance proceeds may in no way have been the motive or objective of the murder conspiracy.

Of course, as to the admissiblity against Leach of evidence of the declarations of the Kramers, and vice versa, the declarations of Leach and the Kramers respectively may also be considered in determining whether there is prima facie proof by independent evidence of an insurance conspiracy such as would bring the declarations within the coconspirator exception. The Kramers' admissions, however, discount entirely the idea of an insurance conspiracy. At one point, in fact, Lorraine Kramer was asked by the undercover agent: "Did they pay double on it?" She

replied: "No—well, see, we didn't do it for the money. That's the thing . . . . He was a psychopath, but he wasn't insane enough to commit him, and if we did, uh, if we did, he can get out in six months and shoot us all." She and her mother then elaborated on their mutual fear of their victim's violent nature. On Leach's part, his only mention of insurance to Hagler was confined to his description of his bargain with the Kramers as anticipating his being paid off in installments once the Kramers had collected their insurance proceeds. (See *ante,* p. 425.)

This consciousness of the existence of the insurance and expectation of being paid out of its proceeds falls short of establishing, even prima facie, that the conspiracy between Leach and the Kramers was directed towards the successful collection of the insurance. The objective of the conspiracy was to kill Howard Kramer, not to collect insurance, and Leach cared not a whit whence his remuneration came, be it by insurance fraud, bank robbery, or dope peddling.

We note that here no special statutes are involved, such as those making it a crime to commit arson with the intent to defraud an insurer (Pen. Code, §§ 450a, 548), and that the existence of a conspiracy is urged not for the purpose of imposing substantive liability but merely as a vehicle for using otherwise inadmissible hearsay evidence against a defendant. In such circumstances we see no basis for "further breach of the general rule against the admission of hearsay evidence" (*People* v. *Saling, supra,* 7 Cal.3d at p. 853). We accordingly decline to treat a conspiracy to commit a particular criminal offense as necessarily entailing a second conspiracy to collect the insurance proceeds which will be paid as a matter of course upon the successful commission of the contemplated offense. "[T]he looseness and pliability of the doctrine [of conspiracy] present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case." (*Krulewitch* v. *United States, supra,* 336 U.S. 440, 449 [93 L.Ed. 790, 797] [concurring opn. of Jackson, J.]; cf. *People* v. *Saling, supra,* 7 Cal.3d at p. 853.)

It should also be noted that even if the independent evidence heretofore discussed were sufficient to establish that the Kramers and Leach were party to an insurance conspiracy, that evidence would not suffice to admit, solely under the auspices of such insurance conspiracy, any proffered evidence of the extrajudicial declarations which occurred after the death of Howard Kramer. Although evidence was adduced below that the Kramers had received insurance proceeds, there was no

evidence whatsoever as to *when* those proceeds had been received. The mere establishment of the existence of a conspiracy at some time prior to an extrajudicial declaration does not meet Evidence Code section 1223's requirement of prima facie proof by independent evidence that that conspiracy was still in existence at the time of the declaration of which evidence is proffered pursuant to the coconspirator exception. (See *ante,* fn. 10.) The putative insurance conspiracy would normally have terminated upon the receipt of the insurance proceeds, which may well have been months before Leach's admissions to Hagler. Thus even under the insurance conspiracy theory there would still be a need under *Saling* for independent evidence sufficient to establish, prima facie, the existence at the time of the declarations of continuing efforts by the conspirators *qua conspirators*—still acting in concert towards the common objective of carrying out their agreement as to payment, notwithstanding the prior attainment of their primary objective of killing Howard Kramer or collecting the proceeds of insurance on Howard Kramer's life.

In light of the inconsistency between the record in this case and the ruling below that there was independent evidence that the conspiracy was still continuing when Leach began confiding in Hagler some six months after the murder, it appears that the trial court erroneously read *Saling* as holding that once there is independent evidence that one conspirator was induced to enter the conspiracy by a promise of payment, then as a matter of law the conspiracy is to be deemed continuing until such time as other evidence indicates payment has been received. Such a presumption that conspirators who stand in an unenforceable debtor-creditor relationship are going to be motivated by a continuing common desire to make a full and satisfactory accounting, and are going to act in concert towards this objective in continuation of their conspiracy to commit the crime for which payment was promised, belies common sense and adds but another layer of tarnish to the already dull finish of conspiracy doctrine.

Save where efforts at a payoff are necessary to preserve the debtor's personal safety or to insure that the creditor does not bring about the detection of the conspiracy and the apprehension of the defaulting conspirators, it is commonplace for conspirators to forsake each other once the original substantive object of the conspiracy is achieved or abandoned. Such seems to have been the case with the Kramers and Leach. It is hardly surprising that there was no independent evidence that the conspiracy remained operative because of the continuing

collective intention of the conspirators to effect payment,[12] since the evidence of the admissions themselves tends to establish that the conspiracy had terminated and that Leach was being left, in the timeless fashion of forsaken former conspirators, to "twist slowly, slowly in the wind."[13] Hagler's testimony shows Leach to be of the opinion that he was being "burnt," and therefore desperate enough to employ Hagler to coerce from his silent partners some compensation for his crime. The tape recordings of the Kramers' admissions confirm what was powerfully implicit in their lack of action to benefit Leach in the preceding 15 months: that they were far from anxious to implicate themselves by seeking to pay him off, and were seemingly content to abandon him altogether for as long as he remained incarcerated and unable to resort to extortion.

In view of the lack of independent evidence, or indeed of any evidence, of the continuing nature of the conspiracy herein, there is a

---

[12]Certainly there was no independent evidence that the conspiracy was still operative at the time of Leach's admissions to Hagler. It is arguable, however, that there was independent evidence that the conspiracy was operative for at least a limited time after the homicide. Bonnie Sue Mayo testified at trial to having seen Leach after his arrest and having discussed the money due him. Moreover, in the recordings of Lorraine Kramer's admissions to the undercover deputy sheriff, which constitute as to her independent evidence bearing on the admissibility against her of Leach's admissions, there appear two references to Lorraine having herself visited Leach after his arrest. Lorraine first said: "I went to see him and he told me that if he sent anybody to me he would tell them what to say. There is one word, now I went to see him, there is one word, that he told me that he would tell anybody that came to see me. Now, I if you understand my point would you try to see him, find out what this word is you come, come to me with this word and I will give you anything you want." .

Lorraine later indicated her reasons for this dangerous move: "Somebody else knows about it. They came here trying to tell us that they, they needed the money to get him busted out and get him out of the country, and [unintelligible] saw Leach to confirm it, he didn't know the guy. . . . Far as he know, far as I know this Leach is a lunk head and he's telling all his fellow inmates and he's playing a big role and you get out and you say well uh, uh, I know and [pause] take advantage of the situation." Thus the fact of her having visited Leach does not necessarily establish that she and Leach shared a continuing intention to effect payment to Leach, except insofar as Leach could bring pressure to bear on her through released fellow inmates. Even if accepted as establishing that the Leach-Lorraine Kramer conspiracy remained operative after the murder, this visit does not carry that conspiracy up to the time of Leach's admissions to Hagler.

[13]This phrase was acknowledged as "my metaphor" by former presidential adviser John Ehrlichman in the course of a colloquy between Ehrlichman and Senator Lowell Weicker of Connecticut during the Senate Watergate Hearings, on July 26, 1973. The phrase was coined as a description of the tacit abandonment by the Nixon administration of L. Patrick Gray, whose nomination as Director of the Federal Bureau of Investigation was then before the Senate for confirmation, but who had become implicated in the Watergate coverup. (Hearings before the Select Committee on Presidential Campaign Activities of the United States Senate, 93d Cong., 1st Sess. (1973) Watergate and Related Activities, Phase I: Watergate Investigation, Book 7, at p. 2679.)

tangible factual distinction which removes the instant case from the ambit of *Saling*. Evidence of the admissions of Leach and the Kramers was accordingly not admissible under the aegis of the coconspirator exception. Whether it was admissible under another exception to the hearsay rule is a separate question to which we now turn.

### C. Coconspirators' Admissions as Declarations Against Interest

California is one of the few American jurisdictions to heed the virtually unanimous advice of commentators (see, e.g., 5 Wigmore, Evidence (Chadbourne rev. 1974) § 1477, pp. 358-360; McCormick, Evidence (1954) § 255, pp. 549-550; Morgan, *The Rationale of Vicarious Admissions* (1929) 42 Harv.L.Rev. 461, 481) and code drafters (see Fed. Rules of Evid., rule 804(b)(4); National Conference of Commissioners on Uniform State Laws, Uniform Rules of Evidence (Pamphlet ed. 1953) rule 63(10); American Law Institute, Model Code of Evid. (1942) rule 509) by recognizing evidence of declarations against *penal* interest as an exception to the hearsay rule. (Evid. Code, § 1230; *People* v. *Spriggs* (1964) 60 Cal.2d 868, 875 [36 Cal.Rptr. 841, 389 P.2d 377].)[14] Moreover, under California law the declarant's assertion of the privilege against self-incrimination satisfies the unavailability requirement of the against-interest exception (*People* v. *Spriggs, supra,* 60 Cal.2d at p. 875, fn. 3). The question thus arises whether the evidence of the respective declarations of Leach and Lorraine Kramer, which were indisputably adverse to their respective personal penal interests, was ipso facto reciprocally admissible against Lorraine Kramer and Leach notwithstanding the inapplicability of the coconspirator exception.

Writing in 1928, Professor Morgan called for the admissibility of evidence of vicarious admissions to be evaluated in terms of their disserving nature as regards the interests of the declarants, and uncritically assumed that this "would hasten the accomplishment of the end for which the courts appear to be striving in the conspiracy cases, for even where a conspirator's utterances are without the scope of his authority as a representative of his fellows, they are usually against his penal

---

[14]Section 1230 provides: "Declarations against interest. Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

interest." (*Morgan, supra,* 42 Harv.L.Rev. at p. 481.) Professor Morgan's handiwork, the Model Code of Evidence, was only slightly more reserved in its readiness to admit hearsay evidence of declarations incriminating defendants as well as declarants. The Model Code included declarations against penal interest within the against-interest exception and went on to declare that "evidence of so much of a hearsay declaration is admissible as consists of a declaration against interest and such additional parts thereof, including matter incorporated by reference, as the judge finds to be so closely connected with the declaration against interest as to be equally trustworthy." (Model Code of Evid., *supra,* rule 509(2), p. 255; see also *id.,* com., at p. 257.) Professor Wigmore's position was essentially the same as the Model Code's. (See 5 Wigmore, *supra,* § 1465, p. 341.)

Scholarly assessment of collateral assertions within declarations against penal interest has grown more searching as the admissibility of evidence of such statements has gained currency in the case law. The modern view seems first to have been enunciated in a comprehensive article on declarations against interest which concluded from a review of civil decisions that "[j]udicial explanation of the admissibility of collateral statements [was] practically nonexistent." (Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule* (1944) 58 Harv.L.Rev. 1, 59.) This article attacked the expressions of Professors Wigmore and Morgan that declarations against interest bespeak the declarants' trustworthy frames of mind, and suggested that evidence of any portions of declarations against interest—especially declarations against penal interest—not actually disserving to the declarant should be inadmissible.[15] The same conclusion has been reached by more recent analyses specifically concerned with the possible functional equivalency of

---

[15]"Wigmore recognizes that the various tests laid down by the courts for determining the admissibility of collateral statements lead to 'more or less arbitrary results.' He suggests that a more useful test would be: 'All parts of the speech or entry may be admitted which appear to have been made while the declarant was in the trustworthy condition of mind which permitted him to state what was against his interest.' This test states a justification for the doctrine, namely, that a declarant is in a trustworthy frame of mind when he makes a declaration against interest, and that this frame of mind continues for other statements made at the same time. But when a self-serving statement is made along with a disserving one, it may well be doubted that the declarent is in a trustworthy frame of mind when he makes the self-serving statement. It would appear that a self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not. The basis of this exception is not that a declarant is in a general trustworthy frame of mind. The probability of trustworthiness comes from the facts asserted being disserving in character. Once those facts are left behind the probability of trustworthiness for other statements seems highly speculative and conjectural. It would seem, therefore, that the courts are not justified in admitting self-serving statements

declarations against penal interest and declarations of coconspirators as exceptions to the hearsay rule. (See Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis* (1972) 85 Harv.L.Rev. 1378, 1396-1398; Note, *Preserving the Right to Confrontation—A New Approach to Hearsay Evidence in Criminal Trials* (1965) 113 U.Pa.L.Rev. 741, 755-756; Comment, *The Hearsay Exception for Co-Conspirators' Declarations* (1958) 25 U.Chi.L.Rev. 530, 540.)[16]

The criticism of the Model Code's approach to collateral assertions within declarations against interest appears to have had an effect on the draftsmen of subsequent codes of evidence. California's own Evidence Code is silent on the subject both in text (see *ante*, fn. 14) and comments,

---

merely because they accompany disserving statements, and a neutral collateral statement should fare no better.

"     .    .     .    .    .     .    .     .    .     .    .     .    .     .     .     .

"If the concept of penal interest is accepted by the courts and the doctrine of collateral statements is applied to declarations against penal interest, an interesting problem arises. Most of the cases dealing with declarations against penal interest are civil cases and criminal cases where the defendant seeks to use the declarations to exculpate himself and prove the declarant's guilt. Suppose the prosecution offers a declaration by the declarant stating that he and the defendant committed the crime. If the civil rule of the admissibility of collateral statements were applied, the declaration as to defendant's guilt would be admissible, although it is not against interest and has little to guarantee its truth. This would get around the familiar doctrine that the confession of a co-defendant is not admissible against the other defendant—a highly questionable result.

"The *Model Code of Evidence* provides that such collateral statements are admissible 'as the judge finds to be so closely connected with the declaration against interest as to be equally trustworthy.' This test contains the same fault as Wigmore's. It assumes that a declaration against interest involves a truth-telling frame of mind which carries over to statements other than those against interest. But the presence of the declaration against interest does not add to the trustworthiness of neutral and self-serving statements. They would seem equally trustworthy or unreliable whether accompanied by a declaration against interest or not. The test suggested by the *Model Code of Evidence* is applicable to all types of hearsay statements. With equal validity it may be said that whenever the judge finds a hearsay statement trustworthy he should admit it in evidence. As long as the courts adhere to the exceptions to the hearsay rule, it would be more reasonable to confine the use of statements against interest in all cases to the proof of the fact which is against interest, since the reliability of other parts of the statement is conjectural." (Fns. omitted.) (Jefferson, *supra,* 58 Harv.L.Rev. at pp. 60, 62-63.)

[16]The implication of an ostensible coconspirator by a declaration against penal interest has been recognized as being particularly unreliable when the declaration is made after the termination of the supposed conspiracy (*Levie, supra,* 52 Mich.L.Rev. at p. 1173), and this enhanced unreliability is further compounded when the declaration is a confession elicited in the wake of the declarant's arrest. (*Roberts* v. *Russell* (1968) 392 U.S. 293, 295 [20 L.Ed.2d 1100, 1102-1103, 88 S.Ct. 1921]; *Bruton* v. *United States* (1968) 391 U.S. 123, 136; *id.,* at pp. 141-142 [20 L.Ed.2d 476, 485; *id.,* at pp. 488-489, 88 S.Ct. 1620] (dissenting opn. of White, J.); Comment, *Post-conspiracy Admissions in Joint Prosecutions—Effectiveness of Instruction Limiting the Use of Evidence to One Co-defendant* (1957) 24 U.Chi.L.Rev. 710, 712.)

in keeping with rule 63(10) of the Uniform Rules of Evidence and rule 804(b)(4) of the Federal Rules of Evidence. (But see the ambiguous advisory committee's note to rule 804(b)(4), Fed. Rules of Evid. [reprinted in 5 Wigmore, *supra*, § 1477, p. 361, fn. 7].)

We agree with the cogent comment that "[a]lthough it seems reasonable that no man would state a fact which might cause him to suffer financial loss or imprisonment," it is precisely the purpose of the Constitution—and, we might add, the hearsay rule—to "protect defendants from statements of unreasonable men if there is to be no opportunity for cross-examination." (Note, *supra*, 113 U.Pa.L.Rev. at p. 753.) To paraphrase another commentator, it is no victory for common sense to make a belief that unreasonable men are notorious for their veracity the basis for law. (See Levie, *supra*, 52 Mich.L.Rev. at p. 1166.) In the absence of any legislative declaration to the contrary, we construe the exception to the hearsay rule relating to evidence of declarations against interest set forth in section 1230 of the Evidence Code to be inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.[17] There being no other arguable avenue of admissibility for evidence of the

---

[17]This limitation on the against-interest exception was at least implicit in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], decided 18 months after we had ruled in *People* v. *Spriggs, supra,* 60 Cal.2d at page 875, that evidence of declarations against penal interest was admissible in California. We held in *Aranda* that in a joint trial evidence of a self-incriminating extrajudicial statement by one defendant, although competent against the declarant, is nevertheless inadmissible at trial if it includes any language implicating a codefendant which cannot be "effectively deleted without prejudice to the declarant." (63 Cal.2d at p. 530.) This prophylactic ruling was patently premised on the inadmissibility of evidence of such an extrajudicial statement against the codefendant and the ineffectiveness of instructions to the jury to disregard the evidence of the extrajudicial statement in weighing whether the charge against the codefendant has been proved. This reasoning is manifestly inconsistent with the proposition that under the antecedent *Spriggs* case any evidence of a self-incriminatory statement was admissible against all those implicated thereby under the rubric of a declaration against interest. (Cf. *People* v. *Brawley* (1969) 1 Cal.3d 277, 286 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Morales* (1968) 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402].)

The same implicit rejection of the admissibility of evidence of collaterally incriminatory declarations against penal interest may be found in the decisions of the United States Supreme Court "constitutionalizing" the *Aranda* rules. In *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], made binding on the states by *Roberts* v. *Russell* (1968) 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921], the court held the right to confrontation to have been violated by the admission at a joint trial of evidence of the confession of one defendant mutually incriminatory of both defendants, notwithstanding the giving of a limiting instruction to the jury. The court carefully included a caveat to the effect that "the hearsay statement [inculpatory of the codefendant] was clearly inadmissible against him under traditional rules of evidence," and disclaimed any inference that the confrontation clause might still have required exclusion of the evidence in question had it been admissible against the codefendant

hearsay declarations of Leach and Lorraine Kramer against other than the respective declarant, it follows that the admission of evidence of these declarations at the joint trial of defendants Leach and Lorraine Kramer was erroneous.

## III. OTHER CONTENTIONS OF ERROR

### A. FAILURE OF UNDERCOVER AGENT TO GIVE *Miranda* WARNINGS

■ The only non-hearsay objection to the admissibility of evidence of the Kramers' admissions to the undercover agent who posed as a jailhouse friend of Leach (see *ante,* p. 426) which has been pursued on appeal is the rather preposterous contention that the undercover agent should, prior to insinuating himself into the confidences of the Kramers, have delivered to them the *Miranda* warnings normally required as a concomitant of arrest. This claim is premised on the assumption that the authorities already had probable cause to arrest the Kramers at the time of their conversations with the undercover officer. The existence of such

under "any recognized exception to the hearsay rule." (391 U.S. at p. 128, fn. 3 [20 L.Ed.2d at pp. 480-481].)

Although the *Bruton* opinion cited to Professors Wigmore, Morgan, and McCormick (all proponents of declarations against penal interest as an exception to the hearsay rule) as authority for the inadmissibility against the codefendant of the confession in *Bruton* under "traditional rules of evidence," it is at least arguable that the court did not consider whether evidence of the confession was admissible against the codefendant under the decidedly minority rule among American jurisdictions that evidence of declarations against penal interest is admissible as an exception to the hearsay rule. But see *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726], in which the United States Supreme Court ruled that *Aranda* error in a California trial was constitutional error under *Bruton,* but nonetheless failed to meet even the minimal test for reversal of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. The *Aranda* error at issue concerned codefendants' declarations which had implicated the defendant Harrington. Although the point was not discussed, the fact is apparent that the confessions upon which the finding of *Bruton* error was premised had been elicited long after California had through *Spriggs* become a jurisdiction permitting evidence of declarations against penal interest to be admitted at trial as an exception to the hearsay rule. See also *Nelson* v. *O'Neil* (1971) 402 U.S. 622, 626 [29 L.Ed.2d 222, 226, 91 S.Ct. 1723], another California confrontation case wherein the court undertook to declare flatly that one defendant's post-Spriggs "out-of-court confession implicating [a codefendant] *was hearsay as to the latter, and therefore inadmissible against him under state evidence law*" (italics added), and compare *Dutton* v. *Evans* (1970) 400 U.S. 74, 83 and footnote 15 [27 L.Ed.2d 213, 223, 91 S.Ct. 210] (plurality opn. of Stewart, J.), wherein the court took pains to note, in upholding the facial validity of Georgia's unusually broad coconspirator exception, that this aspect of the Georgia hearsay rule was "long-established and well-recognized" under state law and was "hardly unique" in the nation. We doubt the court would accord us such deference were we to rule that ever since *Spriggs,* evidence of conspirators' confessions or admissions also implicating coconspirators has been admissible against those coconspirators as evidence of declarations against interest.

probable cause assertedly imposed upon the investigating officer the duty to inform the Kramers of their rights to counsel and to remain silent. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 358-364 [42 Cal.Rptr. 169, 398 P.2d 361].)

We disagree. While arrest is not a condition precedent to the right to *Miranda* and *Dorado* warnings, custody is: the vice requiring the prophylaxis of the notice of rights is the inherently coercive atmosphere pervading *custodial* interrogation. (*People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515].) Since at the time of their admissions the Kramers were not restrained in any way or under any color of custody, and indeed were unaware that they were even talking to an agent of the state, any coercion operating on the Kramers was not attributable to their being in custody. A fortiori, there was no violation of the Kramers' right to counsel, which attaches independently of *Miranda* and *Dorado* only after the indictment of the accused. (*Massiah* v. *United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199]; *People* v. *Mabry* (1969) 71 Cal.2d 430, 441 [78 Cal.Rptr. 655, 455 P.2d 759].)

## B. INDUCEMENTS EXTENDED TO WITNESS

■ Leach has advanced on appeal two utterly meritless arguments against the admissibility of evidence of his admissions as testified to by Hagler. The first of these contentions is that Hagler's cooperation with the authorities was the fruit of improper inducements.

It is undisputed that the initiative was Hagler's in first informing the authorities of Leach's admissions. The only unusual treatment thereafter accorded Hagler consisted of a check by the police on the status of a criminal charge other than the one on which he was incarcerated, and special arrangements regarding Hagler's transportation to court and conditions of confinement, which arrangements were reasonable in view of the risks incurred by Hagler in agreeing to testify against a fellow inmate.[18]

Counsel for Leach has presented no authority in support of the claim of improper inducement, other than cases emphasizing the need for the

[18]Hagler testified at trial to having twice encountered Leach in connection with judicial proceedings following Hagler's cooperation with the authorities, and to having each time been threatened with physical harm by Leach.

corroboration of accomplice testimony and forbidding the granting of immunity to an accomplice on the condition that the accomplice testify favorably to the prosecution. (*People* v. *Marshall* (1969) 273 Cal.App.2d 423, 427 [78 Cal.Rptr. 16]; *People* v. *Green* (1951) 102 Cal.App.2d 831 [228 P.2d 867].) No showing has been made that the treatment accorded to Hagler, however special, was conditional on the content of his testimony. And while Hagler's testimony was uncorroborated in the strict sense of there being no corroboration of the accuracy of Hagler's *recollection* of Leach's admissions, Leach's account of the killing as related by Hagler was in almost complete accord with the other evidence of the crime. Moreover, there was no showing of any material differences between Hagler's testimony at trial and his initial revelations to the authorities of Leach's admissions.

## C. EVIDENCE OF ESCAPE PLANS

■ Equally unavailing is Leach's contention that in view of his concession of guilt save for his diminished capacity defense (see *ante,* p. 427 & fn. 3), evidence of his admissions to Hagler was inadmissible at least insofar as the admissions concerned his desire to escape because the prejudicial effect of such evidence outweighed its probative value. (See Evid. Code, § 352.) The gist of this objection is hard to fathom. The argument appears to be premised principally on Leach's concession to the jury that he was guilty of second degree murder. It is thus contended that the inference of consciousness of guilt which might be drawn from Leach's aspirations of escape was of no probative value in light of this concession of guilt.

This is a make-weight argument if ever there was one. For one thing, despite repeated assertions to the contrary by Leach's separate counsel at trial and on appeal (see fn. 3, *ante*), we have been unable to find any statement in the record in which Leach explicitly conceded to the jury any degree of guilt in the killing of Howard Kramer prior to his counsel's closing argument subsequent to the introduction of all the evidence in the entire case. In any event, the invocation of Evidence Code section 352 is entirely unpersuasive. Section 352 does confer on the trial court discretion to exclude evidence when its probative value "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." These goals would have been disserved by the exclusion of the evidence in question. Rather than minimize confusion, it would have increased it to have had

the trial court constantly monitoring Hagler's testimony to exclude the few references to Leach's escape plans from the matrix of Leach's admissions as to the murder conspiracy. Leach's hopes for an escape were an integral part of Hagler's relation of Leach's confidence in him and the incentive for Leach to recount to Hagler the circumstances of his crime. It was Leach's intention that Hagler use the money to be extorted from the Kramers to free Leach, either through retention of counsel or by an escape from custody. As such, Hagler's testimony concerning Leach's escape plans was properly admitted in evidence notwithstanding Leach's ostensibly prior, partial concession of guilt.

## IV. PREJUDICIAL EFFECT OF ERROR

### A. DONALD LEACH

■ We cannot reverse Leach's conviction unless "it is reasonably probable that a result more favorable to [him] would have been reached in the absence of the error" of admitting against him evidence of the hearsay declarations of Edith and Lorraine Kramer. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) It is clear almost beyond cavil that in light of the admissibility against Leach of evidence of his own damning admissions to Hagler (Evid. Code, § 1220), Leach suffered no prejudice from the erroneous admission of evidence of the Kramers' statements as well.

The acquittal of Bonnie Sue Mayo may well mean that the jury placed less than total credence on Leach's admissions, as testified to by Hagler, since those admissions strongly implicated Mayo. But it is apparent nonetheless that the jury credited the substance of Hagler's testimony sufficiently to convict Edith Kramer despite the exculpatory testimony of both Edith and Lorraine Kramer and despite the somewhat inconclusive nature of the Kramers' admissions as to Edith Kramer's role in the murder save as an accessory after the fact. Moreover, in view of Leach's concession of guilt, the only issue with respect to which Leach could have been prejudiced by the hearsay evidence was whether Leach had acted with premeditation in committing the murder.

On the issue of premeditation the evidence of the Kramers' declarations had little probative value, since the Kramers were privy neither to Leach's motives in agreeing to commit the killing nor to his mental state at the time he executed his agreement. That the killing of Howard Kramer was an act of callous calculation, committed by prearrangement

and for personal gain, was established beyond peradventure by the evidence of Leach's own utterances. The evidence of the Kramers' statements was essentially cumulative in this regard to the evidence of Leach's admissions; while it may have had a corroborative effect we cannot say that it had any significant additional impact in undercutting Leach's rather pallid effort to mitigate the overwhelming evidence of premeditation under the banner of diminished capacity. There being no reasonable probability of the jury having resolved the issue of premeditation differently had the evidence of the Kramers' statements been excluded, it follows that Leach is not entitled to reversal of the judgment against him.

## B. Lorraine Kramer

A different standard for reversible error must be employed in passing upon the prejudicial effect on Lorraine Kramer's trial of the erroneous admission against her of Hagler's hearsay testimony as to Leach's declarations. "[W]here the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," the incriminated defendant has a federal constitutional right to confront and cross-examine the declarant *cum* codefendant. (*Bruton* v. *United States* (1968) 391 U.S. 123, 135-136 [20 L.Ed.2d 476, 485, 88 S.Ct. 1620]; see *ante,* fn. 17.) When this right to confrontation is denied, an ensuing conviction may stand only if the reviewing court is " 'able to declare a belief that it was harmless beyond a reasonable doubt.' " (*Harrington* v. *California* (1969) 395 U.S. 250, 251 [23 L.Ed.2d 284, 286, 89 S.Ct. 1726], quoting *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The evidence of Leach's admissions was certainly "powerfully incriminating" of Lorraine Kramer, especially in view of the virtual ratification of these admissions by Leach's counsel in argument to the jury, and unlike the Kramers, Leach himself did not appear as a witness at trial. We must accordingly measure the error committed below in admitting evidence of Leach's declarations against the exacting federal standard for harmless constitutional error.

Although the Supreme Court has acknowledged that *Bruton* error "presents a serious risk that the issue of guilt or innocence may not have been reliably determined" (*Roberts* v. *Russell* (1968) 392 U.S. 293, 295 [20 L.Ed.2d 1100, 1103, 88 S.Ct. 1921] [holding *Bruton* applicable both retroactively and to prosecutions under state law]), the court has

explicitly refused to "say that no violation of *Bruton* can constitute harmless error" (*Harrington* v. *California, supra,* 395 U.S. at p. 254 [23 L.Ed.2d at p. 288]). *Bruton* error has been found harmless where "[t]he testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury" (*Brown* v. *United States* (1973) 411 U.S. 223, 231 [36 L.Ed.2d 208, 215, 93 S.Ct. 1565]), and where there was properly admitted against a defendant complaining of *Bruton* error evidence of his own "minutely detailed . . . [extrajudicial] account of the offense [the details of which] were internally consistent, were corroborated by other objective evidence, . . . were not contradicted by other evidence in the case [and] were consistently reiterated . . . on several occasions" (*Schneble* v. *Florida* (1972) 405 U.S. 427, 430-431 [31 L.Ed.2d 340, 344-345, 92 S.Ct. 1056]). These findings of harmless error reflect the Supreme Court's direction of inquiry to the "probable impact" of the inadmissible evidence "on the minds of an *average* jury." (Italics added.) (*Harrington* v. *California, supra,* 395 U.S. at p. 254 [23 L.Ed.2d at p. 288]; cf. Traynor, The Riddle of Harmless Error (1970) at pp. 44-46.)

With due consciousness that an abridgment of a federal constitutional right is not lightly to be declared without prejudicial consequence, we are compelled to such a conclusion in Lorraine Kramer's case. The evidence of the admissions of Leach to Hagler, however "powerfully incriminating," pales dramatically in significance when compared with the tape recordings of Lorraine Kramer's own admissions to the undercover deputy sheriff who was posing as an agent of Leach.[19] (See *ante,* p. 426.) These recordings inescapably bring the trial of Lorraine Kramer within the Supreme Court's above-quoted criteria for harmless *Bruton* error. They provide overwhelming proof of Lorraine Kramer's willing complicity in the death of her father, and indeed are testimony to the compassion of the jury in finding Lorraine Kramer guilty of merely second degree murder while returning a first degree verdict against the youth who at her behest actually committed the murder.[20] (See *ante,*

---

[19]We do not rely upon Lorraine Kramer's testimonial confession to support our conclusion of harmless *Bruton* error. We have squarely held that in such a situation the record of the case must "dispel beyond a reasonable doubt the possibility that the defendant took the stand in an attempt to mitigate the explosive impact" of constitutionally inadmissible evidence. (*People* v. *Spencer* (1967) 66 Cal.2d 158, 169 [57 Cal.Rptr. 163, 424 P.2d 715].) Since the evidence of Lorraine Kramer's extrajudicial admissions compels of itself our conclusion of harmless error, we need not decide the propriety of including her testimonial confession within the calculus of harmless error.

[20]One benefit to Lorraine Kramer of her joint trial with Donald Leach was the fact that, due to his personally unavailing diminished capacity defense, the jury received

p. 427.) We are therefore satisfied beyond a reasonable doubt that Lorraine Kramer suffered no prejudice by virtue of the admission against her of Hagler's testimony as to Leach's declarations.

The judgments of conviction are affirmed.

Tobriner, J., Mosk, J., and Richardson, J., concurred.

McComb, J., and Clark, J., concurred in the judgment.

SULLIVAN, J.—Although I adhere to the views expressed in my dissenting opinion in *People* v. *Saling* (1972) 7 Cal.3d 844, 856-860 [103 Cal.Rptr. 698, 500 P.2d 610] and therefore do not agree with the majority's "explication" of *Saling,* I concur in the judgment and in the majority opinion in all other respects.

---

diminished capacity instructions. The jury then used these instructions to Lorraine Kramer's manifest advantage, a full two years in advance of this court's approval of the concept that one may conspire to commit murder and yet lack the mental capacity to commit—or be held liable for—first degree murder. (See *People* v. *Horn* (1974) 12 Cal.3d 290, 299-300 [115 Cal.Rptr. 516, 524 P.2d 1300].)