Filed 5/9/13  P. v. Harris CA2/3
Opinion following order recalling remittitur and reinstating appeal

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B222583 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA284216) |
| v. | |
| CHRISTOPHER HARRIS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Harris.

Mark Shapiro for Defendant and Appellant Kwana Harris.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Stephanie A. Miyoshi and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Christopher Harris and Kwana Harris appeal the judgments entered following their convictions by jury of first degree murder of Eric Alexander. (Pen. Code, § 187.) Christopher Harris also appeals his conviction by jury of second degree murder of Kevin Decoud. The jury found Christopher Harris committed these offenses for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)), personally and intentionally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)), and committed multiple offenses of murder (Pen. Code, § 190.2, subd. (a)(3)). The jury also convicted Christopher Harris of second degree robbery (Pen. Code, § 211) in which he personally used a firearm (Pen. Code, § 12022.53, subd. (b)), and unlawful possession of a firearm (Pen. Code, § 12021, subd. (a)(1); the jury found both of these offenses were committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)).

On appeal, Christopher Harris contends the trial court erred in admitting into evidence Kwana Harris's hearsay statement identifying him as Alexander's killer and in failing to instruct the jury that Kwana Harris's statement required corroboration. Kwana Harris contends the trial court erred in admitting gang evidence as to her and her defense counsel rendered ineffective assistance. We reject appellants' claims of error and affirm the judgments.

### FACTS AND PROCEDURAL BACKGROUND

1. *The murder of Eric Alexander.*

    a. *The Shooting on September 17, 2004.*

On September 17, 2004, Khaled Fleming heard approximately 10 gunshots. Fleming stepped outside his home and walked toward Sixth Avenue where he saw the doors of a black SUV close and saw the vehicle leave the scene.

At 2:34 a.m. on September 17, 2004, Los Angeles Police Officer Winston Lee received a radio call regarding a shooting in the 4300 block of Sixth Avenue. Upon arrival, Lee saw a man, later identified as Eric Alexander, lying unconscious. Lee found eight .22-caliber bullet casings near Alexander. While at the scene, Lee learned Alexander had died.

Los Angeles Police Detective Stanley Evans found approximately $200 in Alexander's jacket and pants and $150 on the ground nearby. Evans found no cell phone at the scene. Evans inquired of Alexander's relatives regarding a cell phone without success.

A deputy medical examiner testified Alexander sustained nine gunshot wounds, including two fatal wounds.

b. *The family gathering in San Diego*.

One week after the shooting of Alexander, on or about September 24, 2004, members of the Harris family gathered in San Diego at the home of James Hardgraves, the brother-in-law of Christopher and Kwana Harris. The visitors included Christopher and Kwana Harris, their sister Shanea, Mericca Garner, who is the mother of a child by Christopher Harris, and Jamie Hardgraves, James Hardgraves's twin sister.

James Hardgraves recalled the visitors arrived in a black Ford Expedition driven by Kwana Harris. The day the visitors arrived, Kwana Harris told James Hardgraves there were rumors "going around" that she and Christopher Harris had killed Alexander, aka Stoney. Kwana Harris said she was present when Alexander was killed, she kicked him after he was shot and she took his cell phone. Kwana Harris said she had chirped Alexander to get him to the location and knew before he arrived he was going to be harmed. Kwana Harris said Christopher Harris killed Alexander.

During the visit, James Hardgraves also heard Kwana Harris talking on her cell phone in chirped phone calls. In one such call, James Hardgraves heard the caller say, "We know that you killed Stoney, and we know your brother killed Stoney, and we know you are in San Diego, and we're coming out there." Kwana Harris was nervous and called an individual known as L-Bone.

3

James Hardgraves admitted he was afraid to testify in this case and was concerned for the safety of his children and himself. Kwana Harris once told James Hardgraves not to come to court and he had been threatened by Jerry Anthony, aka L-Bone, who was carrying a gun at the time. James Hardgraves was relocated twice by the Los Angeles Police Department.

James Hardgraves admitted that, at the time of trial, he was on probation for a misdemeanor involving moral turpitude.

On cross-examination by Kwana Harris's counsel, James Hardgraves admitted he and Kwana Harris were not close. James Hardgraves had been married to Christopher and Kwana Harris's sister, Alicia, for six years and they had three children. Alicia was in a car crash on August 25, 2004, while driving to Los Angeles to assist Christopher Harris. Alicia died on September 4, 2004, as a result of injuries sustained in the crash. Alicia had been unfaithful to James Hardgraves with a woman introduced to her by Kwana Harris. Also, before Alicia died, one of the Harris's had been involved in a shooting outside the home of James Hardgraves's mother. James Hardgraves conceded "the Harrises were bringing a lot of turmoil and trauma" into his life and he was not happy with them.

During the San Diego visit, Kwana Harris and her sister, Shanea, got into a fight in which Shanea "was throwing knives." Shanea repeatedly told Kwana Harris, "You know what you did. You were wrong." Kwana Harris denied Shanea's accusations.

Jamie Hardgraves, James's twin sister, was present in her brother's apartment when Kwana Harris received chirped phone calls. One call from a woman involved how much money Kwana Harris had obtained from "Stoney." Kwana Harris stated it was not as much money as the caller claimed. The caller also said there was a witness but Kwana Harris said no one was around when Alexander was killed. The caller also asked about Alexander's cell phone and Kwana Harris said she had it.

4

In a second chirped phone call, Jamie Hardgraves heard a male say he knew Kwana Harris was in San Diego and he was going to kill her and her mother.

On cross-examination by Kwana Harris's counsel, Jamie Hardgraves testified Kwana Harris regularly drove a silver car and, to her knowledge, the black truck belonged to Shanea.

        c. *Telephone Evidence.*

Sprint Nextel cell phone and direct connection or "chirp" records for subscribers Eric Alexander and Kwana Harris showed that, on September 17, 2004, there were several brief telephone calls between them commencing at 1:37 a.m. The last of these calls was made at 2:27 a.m. The records also showed numerous direct connect calls were made by Kwana Harris between September 24 and 26, 2004.

Los Angeles Police Detective Sean Hansen analyzed the telephone records for the cell phone numbers assigned to Alexander and Kwana Harris for September 17, 2004. With the assistance of a computer program, Hansen plotted the distance between the cell sites through which the calls had been routed and the scene of the Alexander shooting.

    2. *The shooting of Kevin Decoud.*

        a. *The shooting; Eddie Gilbert's identification of Christopher Harris.*

Eddie Gilbert testified that, on January 15, 2004, he and Kevin Decoud were walking toward 41st Street and Van Ness Avenue when a black Nissan Maxima driven by Christopher Harris stopped a few feet from them.[1] When Christopher Harris asked where they were from, Gilbert and Decoud yelled, "40 Neighborhood Crip[s]." As Decoud approached the Nissan to fight, Christopher Harris said he was not there to fight and fired two shots at Decoud. Christopher Harris also fired twice at Gilbert but missed.

---

[1] Eddie Gilbert was declared unavailable due to mental incompetence and his preliminary hearing testimony was read to the jury.

5

Decoud died as the result of a gunshot wound to the chest. During an autopsy, a deputy medical examiner recovered a bullet from Decoud's body.

Gilbert recognized Christopher Harris because, in December of 2004, Christopher Harris robbed Gilbert in the backyard of a residence on Second Avenue. On that occasion, Christopher Harris approached Gilbert from behind, said, "C.J. This is 58 Neighborhood," "fuck 40's . . . phonies" (disrespecting Rolling 40's), and "break yourself," and placed a gun to Gilbert's throat. Gilbert surrendered a Yankees cap and a blue jacket with a dragon on the sleeve and the back.

b. *Arrest of Christopher Harris; recovery of Decoud murder weapon.*

On January 1, 2005, a sheriff's deputy impounded a vehicle being driven by Christopher Harris. During an inventory of the contents of the vehicle, the deputy recovered a nine-millimeter semi-automatic pistol.

A criminalist testified the bullet recovered during the autopsy of Decoud had been fired from the firearm found in Christopher Harris's car.

3. *Investigation.*

a. *Search warrant served at the home of Merrica Garner.*

On February 23, 2005, Detective Jason Delacova applied for a search warrant for the home of Mericca Garner. The items sought in the warrant included a baseball cap, a jacket with a dragon on it, a handgun and ammunition. The warrant was served on February 25, 2005.

b. *Garner's statement to detectives.*

Following service of the warrant, Garner was interviewed at the police station, first by Detectives Lee and Delacova and then by Detective Evans. Tape recordings of the interviews were played for the jury. Detective Evans testified that, after he read Garner her rights, she made a statement and Evans asked her to put it in writing. While Garner wrote the statement, Evans discovered the tape had run out and put in a new one. The missing portion of the interview included the reading of Garner's rights and the statement in which Garner provided information. After Evans restarted the tape recorder, he went over Garner's written statement with her. Garner was not aware

the interview was being recorded.  Garner was at the police station for approximately five hours, commencing at 10:00 a.m.  She was interviewed for approximately three and a half hours.

In the initial interview conducted by Detectives Lee and Delacova, Garner said Christopher Harris was a member of 48 Neighborhood, which was a small gang associated with the "40's," but indicated the police had him on file as a member of the 60's.  Garner denied Christopher Harris ever told her that he had killed someone.  Delacova advised Garner he had a pretty good case against Christopher Harris for a crime he committed with a female.  Garner denied she was the female and stated the black Expedition was Shanea's car.  Garner claimed Christopher Harris told her only that people thought he was responsible for the murder.

After Detective Evans took over the interview, Evans suggested Garner might have unwittingly driven Christopher Harris to the scene of a crime and asked if she knew Eric Alexander, aka "Stoney."  Garner identified a photograph of Alexander as someone she had seen with Christopher Harris.  Garner also identified a picture of Jerry Anthony, aka "L-Bone."  Garner admitted she had been very friendly with Kwana Harris, who was also known as "Lady L-Bone," which suggested "L-Bone" had brought Kwana Harris into his gang.

Garner agreed that on September 17, 2004, Kwana Harris and Shanea had a black SUV and that Kwana Harris was the primary driver of the vehicle.  Evans told Garner he wanted to know if Garner were an accomplice, an accessory or merely a witness.  Evans indicated he was going to present the case to the district attorney for filing and, if Garner lied to Evans, it would suggest she had been involved in the crime.  Garner denied Christopher Harris spoke to her about what happened to Alexander.  However, he did tell her the "40's" were after him because they thought he had killed Alexander.  Evans indicated that, at some point, Garner's lies would force Evans to read Garner her rights.

7

The second audiotape commences with Evans suggesting they read over Garner's written statement. Evans then reads a statement which indicates that, on the night of September 18, 2004, Christopher Harris told Garner that he killed Alexander because of some things Alexander had said about him. The statement also indicated Christopher Harris "felt bad about the situation . . . ." Christopher Harris did not provide details but said, "I did it."

        c. *Recorded telephone conversation.*

On the evening of February 25, 2005, Christopher Harris placed a telephone call from jail to Loretta Brown, his girlfriend at the time. A tape recording of the call was played for the jury. During the call, Christopher Harris asked Loretta Brown to telephone Mericca Garner. After Garner entered the conversation, Christopher Harris told her to "be careful what you say" and asked what had happened. Garner said numerous police officers, including Detective Evans, came to her house with guns. Garner and her baby were taken to the police station from 10:00 a.m. until 3:00 p.m. because she "wasn't cooperating." Garner said the officers advised her of her rights and threatened to arrest her and put her child in "the system." Garner told the officers Christopher Harris did not murder Alexander but the officers accused her of lying. When Garner told Christopher Harris the search warrant involved a gun, a hat and a leather coat, he responded, "Oh for real?"

After the conversation with Garner ended, Christopher Harris told Brown he needed her "to really think . . . ." Brown said she had heard what Garner had said and indicated, "I know. I know already." After further discussion, Christopher Harris told Brown to "go to Aneisha's house. I need you to go to Sean's room and get the dragon thing out of there. It's a dragon. Remember, remember? . . ." When Christopher Harris asked if Brown "got it," she replied, "I already thought of that a long time ago . . . ."

8

4. *Garner's trial testimony.*

At trial, Garner denied that on September 18, 2004, she had a conversation with Christopher Harris in which he said he had killed Alexander and felt bad about it. Garner also denied that Kwana Harris ever told her she took a cell phone or money from Alexander. However, written statements signed by Garner, exhibits 15 and 16, indicate she made these statements to Evans. Exhibit 15 states: "Night of September 18, 2004, CJ [Christopher Harris] spoke with me and told me that he had killed Stone because of something he [said] about him. . . . He cried and told me he felt bad about it." Exhibit 16 states: "Kwana also told me that she didn't find any money and that she drove the truck over there to Stone. . . . Her main concern to me was that she wanted no part of the murder. The cell phone would have made it look like a setup because her name was the last name on the phone."

Garner admitted she did not want to testify in this case because the defendants were her son's father and aunt.

On cross-examination by Christopher Harris's counsel, Garner testified the detectives indicated they thought Garner was involved in the killing of Alexander. Garner thought she was going to be arrested for murder and Detective Evans "guided" her through the written statement and told her she had to sign it.

On cross-examination by Kwana Harris's counsel, Garner testified the written statements were not true and Garner wrote them because she believed she had no choice. Garner thought her child would be taken from her if she did not cooperate. Further, Garner told the detectives the fight between Shanea and Kwana Harris in San Diego was over a SIM card.

Kwana Harris's counsel called Garner as a defense witness and elicited that James Hardgraves has a reputation in the community for lying. Garner also testified Shanea used Kwana Harris's cell phone. Further, everyone in San Diego used her cell phone because it was a chirp phone and everyone had their own code they could use on her cell phone. In September of 2004, Kwana Harris lived with her mother.

9

5. *Testimony of the gang expert.*

Los Angeles Police Officer Aron Algren testified as a gang expert. In the 1980s, the Crips gang split into numerous subsets including the Rolling 40's and the Rolling 60's. Algren estimated that in 2004 and 2005, the Rolling 60's had between 2,000 and 3,000 members, and the Rolling 40's had approximately 1,000 members. Both gangs have rather large territories. In 2005, the 48 Neighborhood Crips had 15 to 20 members. The 48 Neighborhood Crips was aligned with the Rolling 40's and the Rolling 60's and its territory was between the territory claimed by the Rolling 40's and the Rolling 60's. The primary activities of these gangs included the sale of narcotics, robbery, attempted murder and murder. At times there were violent rivalries between the Rolling 40's and the Rolling 60's. Gangs wield power based on the threat of violence which prevents citizens from reporting crimes committed by gang members.

In Algren's opinion, in 2004 and 2005, Christopher Harris was a member of the 48 Neighborhood Crips and an associate of the Rolling 60's. Christopher Harris had extensive gang tattoos. Also, during a traffic stop in 2003, Christopher Harris admitted to a Los Angeles police officer that he was a member of the 48 Neighborhood Crips and an associate of the Rolling 60's. Algren also testified Kwana Harris was an associate of the Rolling 60's.

Based on hypothetical questions, Algren opined the shooting of Eric Alexander, the robbery of Eddie Gilbert, and the shooting of Kevin Decoud, each of whom was a member of the Rolling 40's, had been committed for the benefit of the 48 Neighborhood Crips and the Rolling 60's.

6. *Defense evidence presented by Christopher Harris.*

With regards to Eddie Gilbert's competence, a forensic psychiatrist testified Gilbert was admitted to Patton State Hospital in February of 2009. At that time, Gilbert was severely disabled and was diagnosed as having disorganized schizophrenia and polysubstance abuse.

A second forensic psychiatrist testified that, in a videotaped interview, Gilbert displayed signs of schizophrenia and a rhythmic motor tremor which is a side effect of medications commonly prescribed for schizophrenia. The use of PCP can cause aggressive outbursts, hallucinations and extreme emotional volatility.

The parties stipulated PCP was found in Decoud's blood.

## CONTENTIONS

Christopher Harris contends the trial court erroneously admitted into evidence Kwana Harris's hearsay statement identifying him as Alexander's killer and committed instructional error in failing to instruct the jury the statement required corroboration. He further contends the cumulative prejudice attributable to these errors requires reversal of his convictions even if either error, considered alone, would be insufficient to warrant that result.

Kwana Harris contends the trial court erred in admitting gang evidence as to her and defense counsel rendered ineffective assistance.[2]

## DISCUSSION

1. *The trial court properly admitted Kwana Harris's hearsay statement incriminating Christopher Harris as a statement against her penal interest.*

Prior to trial, the prosecutor filed a motion seeking to admit into evidence statements made by Kwana Harris to James Hardgraves and Mericca Garner, and statements overheard by James Hardgraves, Jamie Hardgraves and Mericca Garner during Kwana Harris's chirped telephone calls. The trial court conducted a hearing on the motion and concluded these statements were admissible as declarations against Kwana Harris's penal interest.

---

[2] Each appellant also joins in all arguments raised by the other which may inure to his or her benefit. However, the claims raised are either personal to the appellant asserting them or so plainly meritless when considered in the context of the co-appellant's situation that we have no occasion to consider whether a contention raised by one appellant might accrue to the benefit of the other.

11

On appeal, Christopher Harris contends the statement in which Kwana Harris identified Christopher Harris as the individual who shot Alexander was not "specifically disserving" of Kwana Harris's interests and thus was not admissible under the declaration against interest exception to the hearsay rule. (*People v. Lawley* (2002) 27 Cal.4th 102, 153-154; *People v. Duarte* (2000) 24 Cal.4th 603, 612; *People v. Garcia* (2008) 168 Cal.App.4th 261, 289.) Christopher Harris notes *People v. Lawley, supra,* at pp. 153-154 and *People v. Garcia, supra,* at pp. 289-290, held the portion of an aider and abettor's statement identifying a confederate was not admissible as a statement against interest. He reasons that, similarly, the portion of Kwana Harris's statements identifying Christopher Harris as the shooter did not incriminate Kwana Harris and should have been excluded.

Christopher Harris claims the only other evidence implicating him in the murder of Alexander was Garner's written statement to Detective Evans which was unreliable in that Garner initially told the detectives Christopher Harris did not admit the killing and she testified at trial that she attributed incriminating statements to Christopher Harris only because the detectives threatened her with arrest, prosecution and the loss of her child. Christopher Harris notes Detective Evans accused Garner of driving the shooter to the crime scene and said he would assume she was "a player" unless she told him the truth. Garner's statement also was suspect because the portion of the interview in which Garner was advised of her rights and initially incriminated Christopher Harris was not recorded.

Christopher Harris concludes that, absent Kwana Harris's improperly admitted hearsay statement, it is reasonably probable he would have been acquitted of count one. Thus, the conviction and the multiple murder special circumstance finding must be reversed. Further, because the error likely had an adverse effect on the jury's evaluation of his self defense claim as to count four, the murder of Decoud, that conviction should also be reversed.

12

We conclude the trial court correctly found the statement admissible as a declaration against Kwana Harris's penal interest. Under that exception to the hearsay rule, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible . . . if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

In order for a statement to be admissible as a declaration against penal interest, " '[t]he proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584.)

Because of concerns that declarations against penal interest may contain self-serving and unreliable information, the exception generally does not "apply to collateral assertions within declarations against penal interest." (*People v. Campa* (1984) 36 Cal.3d 870, 882.) Further, "[e]ven a hearsay statement that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect. [Citation.] Ultimately, . . . 'whether a statement is self-inculpatory or not can only be determined by viewing it in context.' [Citation.]" (*People v. Duarte, supra,* 24 Cal.4th at p. 612.) Only those portions of the declaration that are "specifically disserving" to the declarant's penal interests are admissible under Evidence Code section 1230. (*People v. Leach* (1975) 15 Cal.3d 419, 441)

13

"Courts applying [Evidence Code] section 1230 to determine the basic trustworthiness of a proffered declaration are . . . to 'consider all the surrounding circumstances to determine if a reasonable person in [the declarant's] position would have made the statements if they weren't true.' " (*People v. Duarte*, *supra*, 24 Cal.4th at p. 618.)

We review a trial court's determination under Evidence Code section 1230 for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 536; *People v. Lawley*, *supra*, 27 Cal.4th at pp. 153-154.)

Here, there is no dispute that codefendant Kwana Harris was unavailable as a witness at trial. This leaves us to consider whether the statement was against Kwana Harris's penal interests when made and whether it was reliable.[3] With respect to the first issue, Christopher Harris agrees the trial court properly admitted evidence of many of Kwana Harris's statements to James Hardgraves as contrary to her penal interest, such as her statement she lured Alexander to the scene of the shooting and took his cell phone. Christopher Harris focuses on Kwana Harris's statement that Christopher Harris shot Alexander and appears to argue a statement implicating a codefendant, by definition, cannot be specifically disserving of the declarant's penal interest.

However, the law does not require blanket exclusion of such statements. Rather, whether such a statement is admissible as against the declarant's penal interest depends on the circumstances under which the statement was made, the declarant's possible motivation and the declarant's relationship to the defendant. (*People v. Geier*, *supra*, 41 Cal.4th at p. 584.) The distinction to be drawn is between statements which are truly self-inculpatory, and therefore admissible, and those which are partially self-serving and exculpatory, and therefore inadmissible.

---

[3] Christopher Harris concedes Kwana Harris's statement was not testimonial and thus does not implicate the Confrontation Clause. (*Davis v. Washington* (2006) 547 U.S. 813, 821-823 [165 L.Ed.2d 224].)

14

Review of the case law reveals the statements at issue in the cases cited by Christopher Harris were excluded not because they incriminated individuals other than the declarant, but because they were exculpatory, self-serving, or collateral to the declaration against interest. This point is illustrated by a review of relevant cases.

For example, in *People v. Leach*, *supra*, 15 Cal.3d 419, several defendants were charged with conspiracy to commit murder. Prior to trial, some of the defendants made statements that described the conspiracy and inculpated themselves and other defendants. (*Id.* at pp. 438-442.) *Leach* held the statements should not have been admitted at trial, noting the exception for admissions against penal interest was "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*Id.* at pp. 441-442, fn. omitted.) *People v. Duarte* explained the holding in *Leach* rested on considerations of reliability, noting a facially inculpatory statement, when viewed in context, may actually be exculpatory or self-serving, and thus untrustworthy.

In *Duarte*, the defendant and another man were charged with shooting at a dwelling. (*People v. Duarte, supra,* 24 Cal.4th at pp. 607-609.) Prior to trial, the defendant's accomplice gave the police a statement acknowledging participation in the crime, but minimizing his role. A redacted version of the statement was admitted at the defendant's trial as an admission against penal interest. (*Id.* at p. 609.) *Duarte* reviewed case authority and stated: "Under the rule of *Leach,* a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' " (*People v. Duarte, supra,* at p. 612, quoting *In re Larry C.* (1982) 134 Cal.App.3d 62, 69.) Applying this rule, *Duarte* concluded the redacted statement, viewed in context, was self-serving and thus should have been excluded from evidence. (*People v. Duarte, supra,* at pp. 612-613.)

However, *People v. Samuels* (2005) 36 Cal.4th 96, clarified that *Leach* and *Duarte* do not exclude a statement that inculpates the declarant and other individuals, provided the declarant's facially inculpatory statements are not, in fact, exculpatory,

15

self-serving, or collateral. In *Samuels*, the defendant asked one Bernstein to murder her husband and, once Bernstein had done so, she successfully solicited two other men to murder Bernstein. At trial, a witness testified Bernstein said, " 'He had done it and . . . [the defendant] had paid him.' " (*Id.* at p. 120.) On appeal, the defendant contended Bernstein's statement the defendant had paid him to commit the murder was inadmissible as it constituted an attempt to shift blame to her. (*Ibid.*) *Samuels* held the entire statement was properly admitted as against the declarant's penal interest, notwithstanding the reference to the defendant. *Samuels* stated, "This admission, volunteered to an acquaintance, was specifically disserving to Bernstein's interests in that it intimated he had participated in a contract killing – a particularly heinous type of murder – and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to [the] defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of Bernstein's precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id.* at p. 121.)

Here, as in *Samuels*, Kwana Harris's statement that Christopher Harris shot Alexander was not an attempt to mitigate her involvement in the offense, deflect responsibility for the crime or shift blame to others. Rather, the statement explained her involvement in the murder, namely, luring Alexander to the location where her brother, Christopher Harris, shot him and thereafter taking Alexander's cell phone in an attempt to eliminate evidence connecting her to the offense. Because the entire statement was against Kwana Harris's penal interest, it fell within the exception and properly was admitted at trial as substantive evidence of Christopher Harris's guilt.

We reached a similar conclusion in *People v. Cervantes* (2004) 118 Cal.App.4th 162. In that case, a nontestifying codefendant, Morales, inculpated himself and two codefendants in a murder and an attempted murder while speaking to a friend of all three defendants. (*Id.* at pp. 166-167.) On appeal, the two codefendants contended Morales's statement to the friend should have been excluded.

16

(*Id.* at p. 169.) *Cervantes* found the trial court properly admitted evidence of the statement at the defendants' joint trial as a declaration against penal interest. (*Id.* at p. 177.) *Cervantes* noted Morales did not attribute blame to the codefendants but accepted an active role in the crimes and described how he had directed the activities of one of the codefendants. (*Id.* at p. 175.) Further, because the declarant was acting in concert with the codefendants, a statement incriminating a codefendant also incriminated the declarant. (*Id.* at p. 176.)

*Cervantes* relied heavily on an earlier case, *People v. Greenberger* (1997) 58 Cal.App.4th 298, which involved a kidnapping and murder committed by several defendants. *Greenberger* held the trial court properly admitted evidence of a codefendant's statement in which the codefendant admitted planning the kidnapping and acting as an aider and abettor while a codefendant held a gun on the kidnapped victim. (*Id.* at pp. 339-340 & p. 340, fn. 16.) *Greenberger* held the reference to the codefendant was "an integral part of the statement in which [the declarant] implicated himself in planning and participating in the kidnapping and murder . . . ." (*Id.* at p. 340.)

*Lawley* and *Garcia*, the cases cited by Christopher Harris, excluded portions of statements not because the statements inculpated individuals other than the declarant, but because the circumstances under which the statements were made suggested the statements were not reliable.

In *People v. Lawley*, a statement by the actual killer that he was hired to kill the victim was properly admitted as a declaration against penal interest. (*People v. Lawley, supra*, 27 Cal.4th at p. 154.) However, the trial court did not abuse its discretion in excluding the killer's statement he had been hired by the Aryan Brotherhood, rather than the defendant, because that portion of the statement was not "specifically disserving" of the declarant's interest. (*Ibid.*) *Lawley* found the portion of the declarant's statement indicating the identity of the entity that paid for the murder did not make the declarant more culpable. (*Id.* at pp. 153-154.) Rather, the declarant's reference to the Aryan Brotherhood could only be understood as an attempt to

17

exculpate the defendant. Thus, it was collateral to the declarant's inculpatory statements. (See *People v. Samuels, supra,* 36 Cal.4th at pp. 120-121.)

*People v. Garcia,* addressed the admissibility of a note sent by the cellmate of a defendant. *Garcia* rejected the argument the note was admissible as a declaration against penal interest because, while one statement in the note asserted the author had written the note, another said he had done so as a favor to the defendant. (*People v. Garcia, supra*, 168 Cal.App.4th at pp. 286-290.) Thus, the statements were not wholly inculpatory. Here, Kwana Harris's statement that her brother shot Alexander was not collateral, exculpatory or self-serving. Rather, it implicated her in the murder of Alexander and thus qualified as a declaration against Kwana Harris's penal interest.

Kwana Harris's statement also was reliable. "[A]ssessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' [Citation.]" (*People v. Duarte, supra,* 24 Cal.4th at p. 614.) Generally, the least reliable circumstance is when the declarant has been arrested and makes his statement to police in an attempt to improve his situation. The most reliable situation is one in which the conversation occurs between friends in a non-coercive setting. (*People v. Greenberger, supra,* 58 Cal.App.4th at p. 335; *People v. Cervantes, supra,* 118 Cal.App.4th at p. 175.)

Kwana Harris made the statement at issue to James Hardgraves, Kwana Harris's brother in law, one week after the shooting during a family gathering long before police had focused their investigation on the Harris family. Further, the statement incriminating Christopher Harris as the shooter in the murder of Alexander was not made for self-serving motives or under circumstances that rendered it suspect or unreliable. Kwana Harris was not trying to deflect responsibility for the crime. Rather, the statement was part of her admission she had taken an active role in causing Alexander's death. In sum, the circumstances under which the statement was made indicate it was reliable.

18

We therefore conclude the Kwana Harris statement was against her penal interest and bore a particular guarantee of trustworthiness such that the trial court did not err in admitting evidence of the statement against Christopher Harris.

Moreover, even assuming the statement should have been excluded, any error in its admission was harmless in light of Garner's written statement in which she told Detective Evans that, on September 18, 2004, the day after Alexander was killed, Christopher Harris told her that he killed Alexander because Alexander was saying things about him. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Samuels, supra,* 36 Cal.4th at p. 120 [applying *Watson* standard of review to error in admitting hearsay under Evid. Code, § 1230]; *People v. Duarte, supra,* 24 Cal.4th at pp. 618-619 [same].)[4]

Although Christopher Harris denigrates Garner's statement as the likely product of coercion, it appears the detectives did no more than urge Garner to tell the truth. It is settled that, " ' "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]" ' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) Given that Garner's written statement incriminating Christopher Harris properly was admitted at trial, any error in the admission of Kwana Harris's statement must be seen as harmless.

2. *Accomplice instructions unnecessary.*

Christopher Harris contends the trial court erred in failing to instruct the jury, sua sponte, to determine whether Kwana Harris was an accomplice, and, if so, that her statement incriminating him required corroboration. CALCRIM No. 334 would have advised the jury it could use Kwana Harris's statements to convict Christopher Harris only if: "The accomplice's statement is supported by other evidence that you believe,"

---

[4]     Our harmless error analysis ignores the chirped telephone calls overheard by James Hardgraves in which some unidentified male said he knew Kwana and Christopher Harris had killed Alexander. As Christopher Harris correctly notes, this evidence was not offered for its truth and was not offered against Christopher Harris.

the "supporting evidence is independent of the accomplice's statement," and the "supporting evidence tends to connect the defendant to the commission of the crime." (CALCRIM No. 334.) Although Kwana Harris's self-incriminating statements were corroborated by the phone records and the fact Alexander's phone was never found, this evidence did not connect Christopher Harris to the crime. Rather, the only supporting evidence that tended to connect him to the crime was Garner's written statement, which Garner retracted at trial and was the product of at least some coercion. Christopher Harris concludes that, had the accomplice instruction been given, it is reasonably probable the jury would have determined Kwana Harris's statement incriminating Christopher Harris was not sufficiently corroborated and acquitted him on count one. (*People v. Lewis* (2001) 26 Cal.4th 334, 371.)

Based on our conclusion in the foregoing discussion section that Kwana Harris's statement incriminating herself and Christopher Harris properly was admitted as a declaration against Kwana Harris's penal interest, accomplice instructions were not required.

Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The purpose of Penal Code section 1111 is "[t]o ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547.) "Testimony," as used in Penal Code section 1111, includes "all out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances." (*People v. Williams* (1997) 16 Cal.4th 153, 245; *People v. Brown, supra,* 31 Cal.4th at p. 555; *People v. Belton* (1979) 23 Cal.3d 516, 524-525.)

However, as explained in *People v. Brown*, the corroboration requirement does not apply where the accomplice's statement bears sufficient indicia of reliability to permit admission under the declaration against the penal interest exception to the hearsay rule. " 'The usual problem with accomplice testimony – that it is consciously self-interested and calculated – is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed in evidence.' [Citation.]" (*People v. Brown*, *supra*, 31 Cal.4th at pp. 555-556; see also *People v. Williams* (1997) 16 Cal.4th 635, 682 [instructional duty not triggered where accomplice statements "made in the course of and in furtherance of the conspiracy were not made under suspect circumstances and therefore were sufficiently reliable to require no corroboration"].)

Here, Kwana Harris's statement to James Hardgraves that Christopher Harris shot Alexander was made under conditions sufficiently trustworthy to permit admission of the statement into evidence as a declaration against penal interest. Therefore, although Kwana Harris was an accomplice in the murder of Alexander, corroboration was not necessary and the trial court was not required to instruct the jury her statement required corroboration. (*People v. Brown*, *supra*, 31 Cal.4th at pp. 555-556.)

Christopher Harris attempts to distinguish *Brown* on the ground the defendant in that case did not identify a codefendant by name. However, as previously discussed, the fact a statement inculpates individuals other than the declarant does not render the statement suspect where an examination of the surrounding circumstances indicates the statement was reliable when made.

In any event any error was harmless. As Christopher Harris concedes, the trial court instructed the jury to view out of court statements with caution. (CALCRIM No. 358.) Further, the "failure to instruct on accomplice liability under [Penal Code] section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' . . . The evidence 'is sufficient if it tends to connect the defendant with the

21

crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis, supra,* 26 Cal.4th at p. 370.)

Here, Kwana Harris's statement was corroborated by Garner's written statement in which she indicated that on September 18, 2004, Christopher Harris told her he had killed Alexander. Thus, an instruction requiring corroboration of Kwana Harris's out-of-court statement, had it been given, would not have resulted in a more favorable outcome for Christopher Harris. (*People v. Watson, supra*, 46 Cal.3d at p. 836.)

3. *The trial court properly admitted gang evidence against Kwana Harris.*

Prior to trial, Kwana Harris moved to exclude gang evidence as to her because she was not alleged to have committed the murder of Alexander for the benefit of a criminal street gang. The trial court ruled the prosecution could introduce gang evidence as to Kwana Harris, but that its use would be limited.

Thereafter, the trial court instructed the jury on the uses of gang evidence in accordance with CALCRIM No. 1403, as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged; OR [¶] The defendant had a motive to commit the crime charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

On appeal, Kwana Harris contends the trial court should have excluded the gang expert's testimony as to her, claiming it amounted to evidence of bad character, which is inadmissible under Evidence Code section 1101, subdivision (a), and it encouraged the jury to make negative inferences about her character which were not relevant to her guilt or innocence. (*People v. Archer* (2000) 82 Cal.App.4th 1380,

22

1392.)  Further, the prejudicial effect of the evidence far outweighed any probative value the evidence possessed.  (Evid. Code, § 352.)  Kwana Harris concludes the admission of this evidence rendered the trial fundamentally unfair and requires reversal of her conviction.

Despite its potential for prejudice, gang evidence "is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative.  [Citations.]"  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.)

Here, in order to explain the circumstances leading to the murder of Alexander, the prosecution was entitled to demonstrate the relationship of Christopher and Kwana Harris to the gangs involved in this case because this evidence was relevant to the issues of intent, motive and witness credibility.  The gang expert testified Christopher Harris was a member of the 48 Neighborhood Crips and an associate of the Rolling 60's, and that Kwana Harris was an associate of the Rolling 60's.  This evidence was significant because Alexander, the victim in count one, was a member of the Rolling 40's, a gang that sometimes feuded with the Rolling 60's.  Because Kwana Harris's gang association tended to provide a motive for her involvement in the murder of Alexander, evidence about gang culture and her gang association was relevant to the charge against her.  (*People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1167-1168; *People v. Albarran* (2007) 149 Cal.App.4th 214, 223-224.)

Additionally, evidence of intimidation by gangs was relevant to assist the jury in determining the credibility of witnesses who were reluctant to testify or who recanted earlier statements.

Regarding the assertion the gang evidence amounted to evidence of bad character, the gang expert did not testify Kwana Harris committed any prior bad acts and indicated only that she was an "associate" of the Rolling 60's.

23

With respect to Kwana Harris's claim the evidence should have been excluded under Evidence Code section 352 as inflammatory and unduly prejudicial, no abuse of the trial court's discretion appears. " '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; *People v. Garcia, supra,* 168 Cal.App.4th at p. 275; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413.)

In any event, the testimony as to Kwana Harris's involvement in gangs, as differentiated from the testimony regarding Christopher Harris, was minimal. Moreover, the trial court instructed the jury to limit its consideration of gang evidence to proof of the gang enhancement, which was not applicable to Kwana Harris, and to issues of motive and credibility, and not to consider the evidence for any other purpose. The trial court specifically told the jury not to "conclude from this evidence that the defendant is a person of bad character or that [s]he has a disposition to commit crime." We presume the jury acted in accordance with the instructions given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Holt* (1997) 15 Cal.4th 619, 662; *People v. Delgado* (1993) 5 Cal.4th 312, 331.)

Finally, any abuse of discretion in admitting gang evidence as to Kwana Harris was harmless in light of her incriminating statements that indicated she lured Alexander to the scene of his demise knowing he would be harmed and, after Alexander was killed by Christopher Harris, she took his cell phone to eliminate evidence of her involvement in the crime. These statements were corroborated by telephone records that showed numerous calls between Kwana Harris and Alexander in the hour preceding his death and the fact Alexander's cell phone was never recovered.

In light of this evidence, under any standard of review, the outcome would not have been more favorable had the trial court excluded the gang expert's testimony as to Kwana Harris. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]; *People v. Watson, supra*, 46 Cal.2d at p. 836.)

24

4. *No ineffective assistance of counsel appears.*

Kwana Harris contends her counsel rendered ineffective assistance by failing to present an opening statement, written motions or witnesses on her behalf. She further asserts "there appears to have been no investigation of James Hardgraves or any other witness involved in this matter." Kwana Harris claims her main defense, that she was at home at the time of the shooting of Alexander, was not presented even though several witnesses confirmed they were with her and overheard Alexander's final phone call in which he claimed he was being followed and was frightened. Kwana Harris asserts there is no reasonable explanation for counsel's failure to call these witnesses. She claims defense counsel failed to investigate and failed to present witnesses who would have contradicted James Hardgraves's account of her statements. Finally, she asserts defense counsel also failed to present James Hardgraves's preliminary hearing testimony, which contradicted his trial testimony he bore Kwana Harris no animosity.

The law to be applied is well settled. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*People v. Gray* (2005) 37 Cal.4th 168, 206-207, citing *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674] and *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) A reviewing court defers to " ' "counsel's reasonable tactical decisions in examining claims of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citation.]' " (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Otherwise, the claim is more appropriately raised in a petition for writ of habeas

25

corpus, which permits the opportunity to present additional evidence regarding trial counsel's reasons for acting or omitting to act. (*People v. Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267.)

Taking Kwana Harris's complaints in turn, our Supreme Court has recognized that the decision to waive an opening statement can be a reasonable trial strategy. (*People v. Carter* (2005) 36 Cal.4th 1114, 1189; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 ["The decisions whether to waive opening statement and whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess"].)

With respect to the assertion defense counsel failed to file written motions or call witnesses, Kwana Harris does not specify what motions should have been filed or identify witnesses counsel should have called. Regarding the claim defense counsel should have called witnesses to establish an alibi, the record contains no evidence of any witnesses who could have provided an alibi defense. Further, Kwana Harris makes no attempt to show what the omitted witness's testimony would have been or that the testimony would have been sufficient to create a reasonable doubt as to her guilt. Therefore, this argument is more appropriately presented in a habeas corpus proceeding.

Moreover, defense counsel called prosecution witness, Mericca Garner, as a witness for the defense and elicited that James Hardgraves had a reputation in the community as a liar. Defense counsel also elicited from Garner that other individuals regularly used Kwana Harris's cell phone.

The record also contradicts Kwana Harris's assertion defense counsel apparently failed to investigate James Hardgraves. On cross-examination by Kwana Harris's counsel, James Hardgraves admitted he and Kwana Harris were not close, his wife had been unfaithful to him with a woman introduced to her by Kwana Harris, and his wife died a week after a car crash that occurred while she was traveling to Los Angeles to assist Christopher Harris. Also, before his wife died, one of the Harris's had been involved in a shooting outside the home of James Hardgraves's mother.

26

James Hardgraves conceded "the Harrises were bringing a lot of turmoil and trauma" into his life and he was not happy with them. Kwana Harris's counsel also asked James Hardgraves about the fight between Kwana Harris and her sister, Shanea, during which Shanea produced a knife and Kwana Harris repeatedly denied Shanea's accusation that Kwana Harris had been involved in wrongdoing. Defense counsel also cross-examined James Hardgraves at length as to his memory of incriminating statements made by Kwana Harris.

During cross-examination of Jamie Hardgraves, defense counsel established that she, unlike James Hardgraves, did not recall any specifics in the statements made by Kwana Harris during the weekend in San Diego. Jamie Hardgraves admitted she never heard the name Alexander in the chirped phone conversations and never heard "anything concerning a killing or murder . . . ." Counsel also attempted to show, through the testimony of Jamie Hardgraves, that Kwana Harris regularly drove a silver car, Shanea was the driver of the black SUV and Shanea's behavior was unstable.

Defense counsel also elicited Mericca Garner's testimony that she felt her child would be placed in foster care if she did not give the police a statement. On cross-examination, Garner testified the written statements implicating Christopher and Kwana Harris were false. Further, when Shanea accused Kwana Harris of killing someone, Kwana Harris denied the accusation. Also, Garner did not hear Kwana Harris admit involvement in any killing while they were in San Diego.

The record also indicates defense counsel vigorously cross-examined Detective Evans regarding Garner's written statement and Detective Hansen regarding his analysis of the cell phone records.

Defense counsel thereafter utilized the evidence adduced at trial to urge the jury to acquit Kwana Harris. Defense counsel argued the People's evidence consisted of "word on the street [and] rumors flying around" which were uncorroborated and insufficient for a conviction. Counsel asserted there was no proof Kwana Harris took Alexander's cell phone and there were calls made on the phone after he died which the prosecution had failed to explain. The black SUV was not driven exclusively by

27

Kwana Harris and her cell phone was used by other people. Also, there was evidence indicating Kwana Harris and Shanea fought over a SIM card. Thus, someone might have taken Kwana Harris's SIM card on the night Alexander was shot. Counsel argued Shanea, Garner, Christopher Harris or some other person could have been calling Alexander. Thus, there was an "absence of evidence." Counsel noted James Hardgraves had been convicted of a crime of moral turpitude and his testimony could not be trusted. Further, James Hardgraves did not like Kwana Harris and, according to Garner, a prosecution witness, James Hardgraves had a reputation in the community as a liar. Counsel explained the other people present in San Diego were not called as witnesses because they did not overhear the allegedly incriminating statements and even Jamie Hardgraves, who did testify, did not hear Kwana Harris confess. Counsel noted only James Hardgraves heard the callers claim Kwana Harris had killed Alexander and, where the testimony of James Hardgraves and Jamie Hardgraves differed, the jury should believe Jamie Hardgraves. Counsel argued Garner's statement had to be discounted because of the threats made to take her child from her. In the recorded phone conversation, Garner indicated she frequently stayed at the home of Christopher Harris's mother and Kwana Harris also lived there. Thus, Garner had access to the black SUV and Kwana Harris's cell phone. This explained why Garner would put blame on Kwana Harris. Counsel claimed the cell phone records proved nothing in that the two cell phones were not always together the day after Alexander's death and Kwana Harris's cell phone made calls through one tower and Alexander's phone made calls through two different towers. Counsel closed by arguing the standard of proof and concluded the People had not shown Kwana Harris's guilt beyond a reasonable doubt.

In sum, review of the record leads us to conclude Kwana Harris has failed to demonstrate ineffective assistance of counsel.  (*Strickland v. Washington*, *supra*, 466 U.S. at p. 688.)

5.  *There was no cumulative error.*

Christopher Harris contends cumulative error requires reversal.  However, there can be no cumulative error if the challenged rulings were not erroneous.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382.)  Because none of Christopher Harris's contentions involve error, there is no issue of cumulative error.

## DISPOSITION

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.