Filed 1/14/21  P. v. Clayton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>RASSAN CLAYTON,<br><br>  Defendant and Appellant. | D076177<br><br><br>(Super. Ct. No. SCD280222) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed as modified.

Matthew R. Garcia, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Rassan Clayton of one count of unlawfully taking and driving a vehicle (Veh. Code, § 10851, subd. (a)).  The trial court sentenced him to a total prison term of four years, declined to impose a restitution fine

(Pen. Code, § 1202.4), and imposed but stayed a parole revocation restitution fine of $300 (*id.*, § 1202.45). On appeal, Clayton contends the trial court erred when it excluded statements made against the penal interest of an unavailable witness—his friend who told a defense investigator that he borrowed the vehicle from a homeless man; he was worried *he* could be blamed for taking the vehicle, but was nonetheless willing to tell the truth; and he let Clayton borrow the vehicle. Clayton contends these statements were admissible as statements against penal interest under Evidence Code section 1230.[1] We conclude the trial court properly found the statements were inadmissible hearsay and did not qualify under section 1230, but even if the statements should have been admitted, any error in excluding them was harmless. Clayton further contends—and the Attorney General agrees—the parole revocation restitution fine must be stricken because it was not imposed in an amount equal to the restitution fine. We agree and thus modify the judgment to reflect a $0 parole revocation restitution fine. As modified, we affirm the judgment in full.

FACTS

An information charged Clayton with one count of unlawful taking and driving a vehicle (Veh. Code, § 10851, subd. (a); count 1) and one count of buying, receiving, concealing, selling, or withholding a stolen vehicle (Pen. Code, § 496d; count 2). The information alleged Clayton had two felony priors (Pen. Code, § 1203, subd. (e)(4)) and one strike prior (*id.*, §§ 667, subds. (b)-(i), 668, 1170.12).

At trial, Griffin L. testified that he parked his 2005 Nissan Frontier truck near the La Jolla pier on November 26, 2018. He left his keys wrapped

---

[1] Unless otherwise specified, statutory references are to the Evidence Code.

in a towel on the beach while he went surfing. When he returned to the beach after surfing, he noticed his keys were gone, and then saw his truck was gone. The truck was in good condition when he parked it; it was a white truck with no broken windows. Griffin estimated it was worth approximately $4,500 to $5,000. He reported the truck stolen. A few months later, the truck was returned by law enforcement. The truck had been spray painted black, the front bumper was falling off, the back window was broken, and the inside had been "beaten up very badly." He sold the truck for $1,700.

San Diego Police Department officer Garrett Trainor testified he was patrolling just after midnight on January 18, 2019, when he noticed a Nissan truck that appeared to be "in disarray": it had a spray-painted paint job, the back window was broken out and covered with a wood plank, and it had a headlight out. He ran the license plate and learned the truck had been reported stolen.

Officer Trainor and his partner moved behind the truck and activated their lights for a traffic stop. The vehicle did not pull over immediately, but instead drove for about a mile before finally stopping, even though there was space on the shoulder where the vehicle could have pulled over sooner. The officer identified Clayton as the driver of the vehicle.[2] Clayton was compliant during his interaction with the officers, exited the vehicle upon request, and showed them his identification without issue.

A search of the vehicle revealed no title documentation, pink slips, or paperwork with Clayton's name on it. The key was in the ignition. Unlike the exterior, which was spray painted black, the interior doors were painted white, which indicated to Officer Trainor that the original paint color on the

---

[2] Two female passengers were in the vehicle with Clayton, but they were not arrested in relation to the stolen truck.

3

car was white.  Officers conducted a records check of the license plate and the vehicle's VIN number and confirmed that it belonged to Griffin.

Officer Trainor testified that stolen cars are frequently repainted or their physical appearance is otherwise altered to make it more difficult to match the description of a vehicle reported stolen.

A San Diego County Sheriff's deputy testified that in 2017, he was investigating the theft of a Ford F-350.  When he located the truck, the deputy noted the ignition appeared to have been "manipulated," something he commonly saw in stolen vehicles.  The deputy found Clayton at the truck's location; Clayton told the deputy he was trying to help his friend by selling the truck.  The deputy informed Clayton the vehicle was stolen.

The parties stipulated that the F-350 had been reported stolen by its owner, who did not know who had stolen the truck.

Defense witness Megan F., Clayton's girlfriend and the mother of his child, testified that she believed the Nissan Frontier belonged to their friend Eric T., who had gotten it around Christmastime.  Eric had picked her and Clayton up at Clayton's house and driven them to Eric's house.  They hung out for a while at Eric's, and then Eric gave Clayton the keys, and Megan and Clayton took the truck.  This occurred about two weeks after New Year's Eve, not long before Clayton was arrested.  Megan was not with Clayton when he was pulled over.  Megan acknowledged that, prior to trial, she initially told an investigator from the public defender's office she had never driven in the truck, but later she "cleared that up."

Marivel Castellanos, an investigator for the public defender's office, testified that she interviewed both Megan and Eric prior to trial and subpoenaed them both to testify at trial.  When she spoke with Eric, he

4

relayed information about how Clayton came into possession of the truck. She saw Eric at the courthouse in relation to this case.

The jury was instructed that, to prove Clayton was guilty of unlawful taking or driving a vehicle (Veh. Code, § 10851), the prosecution was required to prove beyond a reasonable doubt that (1) Clayton took someone else's vehicle without the owner's consent, (2) when he took the vehicle, he intended to permanently deprive the owner of possession or ownership of the vehicle, and (3) the vehicle was worth more than $950.[3]

In closing arguments, the prosecutor argued the entire case boiled down to the question of whether Clayton knew the truck was stolen. "Here is how you know. [¶] Look at the condition of this car. You can see battered paint chips. You can see that back window with a very thick board over it. [¶] . . . [¶] But this is not a well-done paint job. This is spray painted. [¶] This is not a well-repaired back window. That is a massive piece of wood. [¶] The interior of the car is in fact still white. And you know that [Clayton] knew, because that's him getting out of one of those doors that has that white trim around it. [¶] He knew he didn't own it." The prosecutor further argued that Clayton had knowledge of stolen cars, as he was caught attempting to resell a stolen vehicle in 2017. The prosecutor questioned the jury, "Is it reasonable to borrow a truck with a busted back window, badly

---

[3]     The jury was further instructed that, with respect to evidence of uncharged acts, if the jury decided by a preponderance of the evidence that Clayton committed those acts, the jury could consider that evidence for the limited purpose of deciding whether Clayton "knew that the motor vehicle had been stolen when he allegedly acted in this case," or "knew he did not have the owner's consent when he allegedly acted in this case," or his actions "were not the result of mistake or accident."

spray-painted, even after having all of this prior experience with a stolen car? [¶] No."

The jury found Clayton guilty of the crime of unlawful taking and driving a vehicle (Veh. Code, § 10851, subd. (a)). The prosecutor dismissed count 2. Clayton admitted the allegations regarding his prior convictions. The trial court declined to strike the prior strike conviction and sentenced Clayton to a total prison term of four years, comprised of the midterm of two years, doubled for the strike.

DISCUSSION

I.

*Excluded Hearsay Statements*

Clayton contends the trial court improperly excluded the defense investigator's testimony regarding statements made by Eric T. during a pretrial interview. Clayton contends the hearsay statements were admissible as statements against Eric's penal interest and were admissible under section 1230.

A. *Additional Factual and Procedural Background*

Prior to trial, Marivel Castellanos, an investigator from the San Diego County Office of the Public Defender, interviewed Eric T. at his home. Eric told the investigator he and Clayton had been "partners for a while" and described their relationship, saying " 'we are tight.' " Eric told the investigator he would not elaborate but he wanted to help Clayton out and be there for him. The investigator's report stated:

> "In regards to the incident, [Eric] was worried that he would get blamed for the stolen truck but was willing to tell the truth. He was on 52nd street and University on the corner of the Buddhist Temple collecting bicycle parts.

> "A homeless guy, he could not describe him, approached him and offered to lend him his truck in order to transport

6

the bicycle parts. [Eric] saw the truck across the street and agreed to borrow it.

"The homeless guy gave him the keys and told [Eric] he could borrow it a few days. [Eric] took the truck, 'the truck was not mine. I borrowed it.' [Eric] did not know the name of the homeless guy and could not give locations of his whereabouts.

"[Eric] allowed Clayton to borrow the truck but they normally took turns driving the truck. [Eric] believes that Clayton was driving the truck when he was arrested.

"[Eric] had nothing further to add so the interview was concluded."

At a pretrial hearing, defense counsel told the court she intended to call Eric as a witness: "With respect to the witness [Eric], I don't believe he would incriminate himself, but we can submit that to the court and see if the court feels that way and if he needs to be counseled. [¶] And just for an offer of proof, what [Eric] relayed to my investigator, he received the truck from another individual, and he let Mr. Clayton drive the truck. [¶] So that is roughly what his testimony would be. I don't know if that rises to the level of him incriminating himself, but I will submit that to the court. [¶] . . . I don't think he is incriminating himself by what he told my investigator."

The court reviewed the investigator's statement and indicated it was "inclined to have counsel appointed to counsel [Eric] on this. I do believe he could incriminate himself, based on what has been provided. [¶] Among other things, he says he has been partners for a while with the defendant. I'm not sure what that means. [¶] He says, at one point during the interview, he was worried he would get blamed for the stolen truck, and then, of course, he is the one that provided the stolen truck. [¶] I think, based on all of that, he should be counseled."

7

Eric was appointed counsel and subsequently invoked his Fifth Amendment privilege against self-incrimination. The parties and the trial court agreed this rendered Eric unavailable as a witness under section 240, subdivision (a)(1). (See *People v. Rios* (1985) 163 Cal.App.3d 852, 866 ["one who refuses to testify based upon the privilege against self-incrimination [citation], may be held to be 'unavailable' for purposes of . . . section 1230"].)

Based on Eric's unavailability, defense counsel requested that Eric's prior unsworn statement be admitted as a statement against interest under section 1230. Counsel argued Eric was a nonparty "who allegedly confessed to a crime" and was unavailable due to the exercise of his privilege against self-incrimination. The court pointed out that defense counsel initially argued the statements were not incriminating. Defense counsel then argued only a portion of the statement should be admitted, contending the part against Eric's penal interests "is when he says he was worried that he would get blamed, but he was willing to tell the truth, and he let Mr. Clayton borrow it." Defense counsel argued the statement was inherently reliable because Eric "in candor made a statement he was afraid he would get blamed." Further, Megan's testimony corroborated some of Eric's story because she testified that Eric gave Clayton the truck.

The prosecutor argued the statements were not incriminating and should be excluded as unreliable and untrustworthy.

The trial court declined to allow the investigator to testify regarding Eric's statement. The court found the statement was not one against interest under section 1230 because it did not "so far subject[] a person to criminal liability that a reasonable man in his position would not have made the statement unless he believe[d] it to be true . . . ." The court further found the statement was not trustworthy or reliable because Eric stated he and Clayton

8

had been "partners for a while," and described their relationship as, " 'we are tight,' " and then offered details that were helpful to Clayton but declined to elaborate—when convenient to Eric—with sufficient information to enable the story to be confirmed or dispelled. The court concluded that the totality of the circumstances, including the statement itself, the relationship with the defendant, and the vague and limited information Eric provided, made the statement untrustworthy and unreliable. The court explained that "it easily can be seen as somebody who wants to help a friend, at the same time without putting himself at any risk." Regarding Eric's statement that he was worried about being blamed for taking the vehicle, the court remarked "I think it is only natural, when somebody is approached for a criminal case that is going to trial, that they might be concerned about somehow getting blamed or involved," but that did not make the statement admissible under section 1230 or reliable.[4]

B. *Applicable Law*

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (*Id*., subd. (b).) One exception is set forth in section 1230, which provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a

---

[4] The prosecutor noted that Eric was interviewed several months into the criminal case, after the preliminary hearing was held.

risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

To qualify for admission under the declaration-against-penal-interest exception to the hearsay rule, the proponent of the evidence must show that "the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).) If the court is required to determine any preliminary facts, such as whether a statement is one against penal interest, that determination is made under section 405.[5] (*People v. Jackson* (1991) 235 Cal.App.3d 1670, 1678.) "The test imposed is an objective one—would the statement subject its declarant to criminal liability such that a reasonable person would not have made the statement without believing it true." (*Ibid.*)

" 'In determining whether a statement is truly against interest within the meaning of . . . section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) "Ultimately, courts must

---

[5] "When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises." (§ 405, subd. (a).)

consider each statement in context in order to answer the ultimate question under . . . section 1230:  Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' "  (*Id.* at p. 716; see *Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 89 ["In order for a statement to qualify under the exception, both the content of the statement and the fact that the statement was made must be against the declarant's social interest."].)

"We . . . bar admission of those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others.  [Citations.]  But we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' "  (*Grimes*, *supra*, 1 Cal.5th at p. 715.)

"We review a trial court's decision whether a statement is admissible under . . . section 1230 for abuse of discretion.  [Citations.]  Whether a trial court has correctly construed . . . section 1230 is, however, a question of law that we review de novo."  (*Grimes*, *supra*, 1 Cal.5th at pp. 711-712.)

C.  *The Trial Court Properly Excluded the Statements*

Clayton contends the trial court erred by precluding the investigator from testifying as to the content of Eric's statements made during the course of her investigation.  Eric's statements, which were made at his home to the investigator and offered to prove the truth of the matters Eric stated, are undisputedly hearsay and are inadmissible unless they qualify under an exception.  (§ 1200, subds. (a), (b).)  Clayton contends the statements qualify

11

as admissible statements made against Eric's penal interest. (*Id.*, § 1230.) We conclude the trial court properly found the statements do not qualify under section 1230 because they were not statements against Eric's penal interest and were not sufficiently reliable to warrant admission.[6] (*Duarte*, *supra*, 24 Cal.4th at pp. 610-611.)

Eric told the investigator he was worried he could get blamed for the stolen truck but was willing to tell the truth. He claimed "[a] homeless guy"—whom Eric could not describe, identify, or locate again—lent him the truck to transport bicycle parts. He claimed to have allowed Clayton to borrow the truck and stated they took turns driving the truck. These statements tend to exculpate Clayton and do not incriminate Eric. Rather, Eric claimed to have borrowed the truck from an unnamed, unidentifiable "homeless guy," but provided no details that could be investigated to either corroborate or disprove his story. The statements are self-serving and unreliable and thus do not qualify as declarations against penal interest. (Compare *People v. Gallardo* (2017) 18 Cal.App.5th 51, 70-76 (*Gallardo*) [jailhouse statements to informants identifying codefendants as shooter and driver of car from which shots were fired were too " ' "self-serving and unreliable" ' " to qualify as declarations against penal interest] with *People v. Almeda* (2018) 19 Cal.App.5th 346, 363-368 [codefendant's nontestimonial jailhouse statements that included details police were able to corroborate were against declarant's own interest were not exculpatory, self-serving, or collateral, and inextricably linked both defendants to crime, and so were

---

[6] The parties do not dispute the third requirement, that the declarant was unavailable, was met. (*People v. Hill* (1992) 3 Cal.4th 959, 990-991 [declarant claimed privilege against self-incrimination and court admitted his statements under section 1230], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

admissible against defendant].)  Eric did not implicate himself in stealing the vehicle, or committing any other crime, but rather stated that a third party allowed him to borrow the vehicle.  The trial court did not abuse its discretion by finding Eric's statements were not contrary to, or "specifically disserving" of, his own penal interests.  (*People v. Leach* (1975) 15 Cal.3d 419, 441.)[7]

The statements also lacked any indicia of trustworthiness.  " 'There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception.  The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. . . .  [T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures.' "  (See *People v. Tran* (2013) 215 Cal.App.4th 1207, 1217.)  Here, Eric made statements to an investigator working on defense counsel's behalf, months into the pendency of the criminal prosecution and after the preliminary hearing had already occurred. He made the statements with the express purpose of "help[ing] out Clayton and be[ing] there for him."  The statements tended to exculpate both Clayton and Eric by claiming that the truck was "borrowed" from an unidentified "homeless guy."  The statements appear to have been made in an attempt to

---

7    Eric's statement that he did not want to be blamed for the crime does not alter our conclusion.  The trial court properly found that Eric likely wanted to help Clayton, and this statement reflected a reluctance to become involved in the investigation, and *falsely* accused, rather than constituting an admission of guilt.  "The statement made to the defense investigator appears more focused on exculpating [the defendant] than implicating [himself]." (*People v. Smith* (2017) 10 Cal.App.5th 297, 304 (*Smith*).)

shift blame for possessing a stolen vehicle to the unidentified "homeless guy." Even assuming portions of Eric's statements can be read as inculpatory to some extent, the statements were nonetheless properly excluded as unreliable. (See *Grimes*, *supra*, 1 Cal.5th at p. 716 ["sometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others. . . . A trial court in that situation may reasonably conclude that the declarant's incentive to protect his friends renders the . . . statement inadmissible"].) Given the circumstances under which the statements were made, the passage of time, the lack of details provided, and the possible motivation to help his close friend, there is no indication Eric's statements were "sufficiently reliable to warrant admission despite [their] hearsay character." (*Duarte*, *supra*, 24 Cal.4th at p. 611; see *Smith*, *supra*, 10 Cal.App.5th at p. 304 [" 'The significant passage of time is a relevant circumstance to be considered when determining a statement's reliability.' "].)

In sum, because the statements were not disserving of Eric's interests and were not reliable or trustworthy, the statements were not admissible as statements against penal interest under section 1230. (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 75-76.)

D. *Any Assumed Error Was Harmless*

Even assuming the trial court erred in excluding the evidence, any assumed error was harmless. Clayton contends he was prejudiced by the exclusion of the evidence because it "(1) denied [him] from presenting his defense that he did not know the truck was stolen and had permission to use the truck; (2) prevented the jury from hearing evidence that someone other than appellant stole the truck; and (3) denied [him] his due process right to a fair trial."

14

Clayton contends the exclusion of the evidence violated his federal due process rights, such that reversal is warranted unless the error was harmless beyond a reasonable doubt.[8] (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) In general, however, "the application of ordinary rules of evidence . . . does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard" (*People v. Marks* (2003) 31 Cal.4th 197, 227), which requires us to determine if a reasonable probability exists that the jury would have reached a different result had the evidence been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Courts typically apply the *Watson* standard to assess whether section 1230 error was harmless. (*Smith*, *supra*, 10 Cal.App.5th at p. 305 [any assumed error in excluding statement under section 1230 held harmless under *Watson* standard]; *People v. Reyes* (2019) 35 Cal.App.5th 538, 549 [erroneous exclusion of section 1230 evidence held to be prejudicial because it was "reasonably probable [defendant] would have obtained a more favorable result in this trial had [the evidence] not been excluded"].)

Whether the state or federal standard for harmless error applies depends on whether the error can be considered a deprivation of federal constitutional rights. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 357.) Any assumed error in excluding Eric's statements to the investigator did not deprive Clayton of his due process rights. Clayton had a meaningful opportunity to present a complete defense despite the exclusion of Eric's statements. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 1019 ["a defendant has no constitutional right to present all relevant evidence in his favor," and "ordinary evidentiary rules do not impermissibly infringe on the

---

8    Clayton did not object on federal constitutional grounds at trial.

15

defendant's right to present a defense"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right."].) Clayton called two witnesses in his defense: the investigator, who testified that both Eric and Megan had been subpoenaed to appear at trial; and Megan, who testified that Clayton obtained the vehicle from Eric, who had acquired the vehicle around Christmas and given Clayton the vehicle a few days before his arrest. The excluded statements, that Eric received the truck from "a homeless guy," and lent it to Clayton but also drove it, were mostly duplicative of Megan's testimony. We therefore reject Clayton's claims he was precluded from presenting his defense that he did not know the truck was stolen, he had permission to use the truck, and someone else stole the truck.

Although we conclude any assumed error should be reviewed under the standard set forth in *Watson*, any assumed error was harmless under the *Chapman* standard too. The jury convicted Clayton of violating Vehicle Code section 10851, which imposes criminal liability on "[a]ny person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle . . . ." (Veh. Code, § 10851, subd. (a).) The statute does not require the individual to steal the vehicle; merely driving it post-theft is sufficient if the individual " 'driv[es] a vehicle without the owner's consent after the vehicle has been stolen, with the intent to temporarily or permanently deprive the owner of title or possession.' " (*People v. Lara* (2019) 6 Cal.5th 1129, 1136.) Although possession of stolen

16

property, on its own, is insufficient to establish guilt of a theft-related offense (*People v. Najera* (2008) 43 Cal.4th 1132, 1138), defendant's culpability can be established when possession is " 'coupled with slight corroboration by other inculpatory circumstances [that] tend to show guilt.' "[9] (*People v. Lopez* (2011) 198 Cal.App.4th 698, 709.) Here, Clayton was caught driving Griffin's truck, which was in a state of "disarray," with a spray-painted black exterior that did not match its white painted interior, a wooden board crudely covering a broken back window, a broken headlight, and a broken bumper. When officers attempted to make a traffic stop, Clayton continued to drive for a mile before finally pulling over. The vehicle contained no documentation indicating Clayton's ownership. Clayton was no stranger to stolen vehicles, as he previously was caught attempting to sell one, purportedly to help a friend. These facts substantially corroborate the inference of guilt for unlawfully driving a vehicle. (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1575 [corroboration accompanying possession of stolen property "may consist of no explanation, of an unsatisfactory explanation, or of other suspicious circumstances that would justify the inference"].) Under these

---

[9] The jury was instructed that "before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state. [¶] If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent or mental state was not proved by the circumstantial evidence. [¶] However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 225.)

circumstances, any assumed error in excluding Eric's statements to the investigator was harmless beyond a reasonable doubt.

## II.

### *Parole Revocation Restitution Fine*

At sentencing, the trial court declined to impose a restitution fine, stating, "There will not be a restitution fine, and the additional restitution fine . . . will be stayed in the amount of $300."[10]  The abstract of judgment reflects a restitution fine of $0 (Pen. Code, § 1202.4) and a parole revocation restitution fine of $300 (*id*., § 1202.45) suspended unless parole is revoked. Clayton contends the parole revocation restitution fine must be stricken because it was imposed in an amount different than the restitution fine.  The Attorney General concedes the parole revocation restitution fine is unauthorized and must be stricken.  We agree.

Penal Code section 1202.4 mandates imposition of a restitution fine when a person is convicted of a crime, unless the court finds compelling and extraordinary reasons for not doing so and states those reasons on the record. (Pen. Code, § 1202.4, subd. (b).)  Penal Code section 1202.45 requires imposition of an additional parole revocation restitution fine in the same amount as the section 1202.4 restitution fine if the sentence includes a period of parole.  (*Id*., § 1202.45, subd. (a).)  Because the restitution fine was set at zero, the parole revocation fine must also have been zero.  (Pen. Code, §§ 1202.4, subd. (b), 1202.45, subd. (a); see *People v. Tillman* (2000) 22 Cal.4th 300, 302.)  We therefore modify the judgment to impose a parole revocation fine of $0.  (*People v. Smith* (2001) 24 Cal.4th 849, 853-854

---

10    The prosecutor did not object to the trial court's failure to articulate its reasons for not imposing the restitution fine.

[imposition of the erroneous amount of a parole revocation fine is correctable on appeal without the need to remand for further proceedings].)

## DISPOSITION

We modify the judgment to impose a $0 parole revocation restitution fine. We direct the trial court to prepare an amended abstract of judgment and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.


GUERRERO, J.

WE CONCUR:



HUFFMAN, Acting P. J.



DATO, J.